IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | | |
|---|---|---|
| JOINT STOCK COMPANY APATIT, | ) | |
| Plaintiff, | ) | |
| and, | ) | |
| THE MOSAIC COMPANY, | ) | |
| Consolidated Plaintiff | ) | |
| v. | ) | Consol. Court No. 24-00226 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and, | ) | |
| THE MOSAIC COMPANY, | ) | |
| Defendant-Intervenor, | ) | |
| and, | ) | |
| JOINT STOCK COMPANY APATIT, | ) | |
| Consolidated Defendant-Intervenor. | ) | |

**PLAINTIFF JOINT STOCK COMPANY APATIT'S RULE 56.2**
**<u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff and Consolidated Defendant-Intervenor Joint Stock Company Apatit ("JSC Apatit") respectfully submits this Motion for Judgment on the Agency Record with respect to the *Final Results* of the U.S. Department of Commerce in the second administrative review of *Phosphate Fertilizers from Russia*, Case No. C-821-825, published as *Phosphate Fertilizers from the Russian Federation:*

*Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,960 (Dep't Commerce Nov. 12, 2024), and accompanying Issues and Decision Memorandum.

JSC Apatit respectfully requests, for the reasons explained in the accompanying Memorandum, that this Court hold that the contested portions of the *Final Results* are not supported by substantial evidence and not otherwise in accordance with law.

JSC Apatit further requests that this Court remand this appeal to the U.S. Department of Commerce to correct its errors consistent with the order and opinion of this Court.

A proposed order is enclosed.

Respectfully submitted,

/s/ Jonathan T. Stoel
H. Deen Kaplan
Jonathan T. Stoel
Maria A. Arboleda

HOGAN LOVELLS
CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hlc.com

*Counsel to JSC Apatit*

Dated: September 11, 2026

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| JOINT STOCK COMPANY APATIT,<br>Plaintiff,<br>and,<br>THE MOSAIC COMPANY,<br>Consolidated Plaintiff<br>v.<br>UNITED STATES,<br>Defendant,<br>and,<br>THE MOSAIC COMPANY,<br>Defendant-Intervenor,<br>and,<br>JOINT STOCK COMPANY APATIT,<br>Consolidated Defendant-Intervenor. | Consol. Court No. 24-00226 |

**PROPOSED ORDER**

Upon consideration of the Motion of Plaintiff and Consolidated Defendant-Intervenor Joint Stock Company Apatit ("JSC Apatit") for Judgment on the Agency Record ("Motion") pursuant to United States Court of International Trade Rule 56.2, and all other papers and proceedings herein, it is hereby:

**ORDERED** that JSC Apatit's Motion is hereby **GRANTED**; and it is further

**ORDERED** that the *Final Results* of the U.S. Department of Commerce ("Commerce") in the countervailing duty second administrative review of Phosphate Fertilizers from Russia, Case No. C-821-825, published as *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,960 (Dep't Commerce Nov. 12, 2024), and accompanying Issues and Decision Memorandum, are hereby remanded to Commerce, with instructions for Commerce to

1) Correct its unlawful mining rights benchmark to meet the requirements set forth in 19 U.S.C. § 1677(5) and 19 C.F.R. § 351.511(a)(2)(iii);

2) Recalculate JSC Apatit's natural gas benefit by excluding JSC Apatit's natural gas purchases from independent gas suppliers;

3) Take any further action as required by this Court's decision and instructions in this matter.

Dated:

_________________________, 2026
New York, New York

________________________________
Hon. Jane A. Restani, Judge

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| JOINT STOCK COMPANY APATIT,<br>Plaintiff,<br>and,<br>THE MOSAIC COMPANY,<br>Consolidated Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant,<br>and,<br>THE MOSAIC COMPANY,<br>Defendant-Intervenor,<br>and,<br>JOINT STOCK COMPANY APATIT,<br>Consolidated Defendant-Intervenor. | Consol. Court No. 24-00226<br>**PUBLIC VERSION**<br>Business Proprietary Information removed from pages 29-31 |

**PLAINTIFF JOINT STOCK COMPANY APATIT'S RULE 56.2**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

HOGAN LOVELLS
CADWALADER US LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.5600
Fax: +1.202.637.5910

*Counsel to JSC Apatit*

September 11, 2026

**TABLE OF CONTENTS**

**Page(s)**

STATEMENT PURSUANT TO RULE 56.2 ....................3

I. Administrative Determination Under Review ....................3

II. Statement of the Issues ....................3

STATEMENT OF FACTS ....................4

SUMMARY OF THE ARGUMENT ....................7

ARGUMENT ....................7

I. STANDARD OF REVIEW ....................7

II. COMMERCE FAILED TO SELECT A LAWFUL PHOSPHATE ROCK BENCHMARK THAT IS REFLECTIVE OF PREVAILING MARKET CONDITIONS IN RUSSIA AND CONSISTENT WITH MARKET PRINCIPLES ....................9

A. This Court's Judgment in the First Administrative Review of the Same Proceeding Compels the Inclusion of Sedimentary Phosphate Rock Data in the Tier-Three Benchmark for This Review ....................11

B. Commerce Unlawfully Interpreted and Applied the Statutory Factors Set Forth in 19 U.S.C. § 1677(5)(E)(iv) ....................13

C. Commerce's Selected Benchmark Cherry-Picked Data That Are Unrepresentative of the Phosphate Rock Market ....................15

D. Commerce's Reliance on Global Trade Atlas Data That Excludes Sedimentary Rock Countries Was Unlawful ....................16

E. Commerce Should Include All Exports from South Africa in its Benchmark Price ....................20

III. COMMERCE UNLAWFULLY COUNTERVAILED JSC APATIT'S NATURAL GAS PURCHASES FROM INDEPENDENT GAS PRODUCERS ....................25

A. Commerce Erred in Concluding That JSC Apatit Could Not Fill the Gap in the Record Left by the Government of Russia ....................26

B. Commerce Unlawfully Concluded That the Information JSC Apatit Provided Is Insufficient to Fill the Gap Left by the Input Producer Appendix ....................29

CONCLUSION ....................32

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Archer Daniels Midland Company v. United States*,
779 F. Supp. 3d 1349 (Ct. Int'l Trade 2025) .......... 21, 25, 31

*Archer Daniels Midland Company v. United States*,
816 F. Supp. 3d 1371 (Ct. Int'l Trade 2026) .......... 9, 11, 12, 18

*Archer Daniels Midland Company v. United States*,
Consol. Court No. 23-00239, Slip Op. 26-92 (Ct. Int'l Trade Aug. 12, 2026).......... 9, 11, 12

*Changzhou Trina Solar Energy Co. v. United States*,
352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) .......... 10, 27

*Changzhou Trina Solar Energy Co. v. United States*,
359 F. Supp. 3d 1329 (Ct. Int'l Trade 2019) .......... 26

*Chevron, U.S.A., Inc. v. NRDC, Inc*,
467 U.S. 837 (1984) .......... 8

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938).......... 7

*Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Tech., Salaried & Mach. Workers, AFL-CIO*,
6 F.3d 1511 (Fed. Cir. 1993).......... 8

*Dunn v. Commodity Futures Trading Com'n*,
519 U.S. 465 (1997).......... 9

*Gallant Ocean (Thailand) Co. v. United States*,
602 F.3d 1319 (Fed. Cir. 2010).......... 7

*GPX Int'l Tire Corp. v. United States*,
942 F. Supp. 2d 1343 (Ct. Int'l Trade 2013) .......... 27

*Guangdong Wireking Housewares & Hardware Co. v. United States*,
900 F. Supp. 2d 1362 (Ct. Int'l Trade 2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014) .......... 25

*Guizhou Tyre Co. v. United States*,
399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019) .......... 27

*Guizhou Tyre Co. v. United States*,
415 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) .......... 28

*Guizhou Tyre Co., Ltd. v. United States*,
523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) .......... 27

*Huaiyin Foreign Trade Corp. (30) v. United States*,
322 F.3d 1369 (Fed. Cir. 2003).......... 8

*Hyundai Steel Co. v. United States*,
798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025).......... 9

*Itochu Bldg. Prods., Co. v. United States*,
163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ........ 8

*Loper Bright Enterprises et al. v. Raimondo*,
603 U.S. 369 (2024) ........ 8, 14

*MacLean-Fogg Co. v. United States*,
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........ 11

*NLRB v. Columbian Enameling & Stamping Co.*,
306 U.S. 292 (1939) ........ 7

*Pesquera Mares Australes v. United States*,
266 F.3d 1372 (Fed. Cir. 2001) ........ 9

*Risen Energy Co. v. United States*,
658 F. Supp. 3d 1364 (Ct. Int'l Trade 2023) ........ 28

*Risen Energy v. United States*,
570 F. Supp. 3d 1369 (Ct. Int'l Trade 2022) ........ 14

*Timex V.I., Inc. v. United States*,
157 F.3d 879 (Fed. Cir. 1998) ........ 9

*Yama Ribbons & Bows Co. v. United States*,
419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019) ........ 28

**STATUTES**

19 U.S.C. § 1516a(b) ........ 7

19 U.S.C. § 1677(5) ........ 2

19 U.S.C. § 1677(5)(B) ........ 3, 10, 25, 29

19 U.S.C. § 1677(5)(E) ........ 10, 13

19 U.S.C. § 1677e(a) ........ 26

19 U.S.C. § 1677e(b) ........ 26

19 U.S.C. § 1677m(d) ........ 31

19 U.S.C. § 1677m(e) ........ 31

**REGULATIONS**

19 C.F.R. § 351.511(a) ........ 2, 10

**ADMINISTRATIVE DETERMINATIONS**

*Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*,
86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ........ 4

*Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2023*,
91 Fed. Reg. 20,639 (Dep't Commerce Apr. 17, 2026) ........ 9, 12

**<u>OTHER AUTHORITIES</u>**

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review and Join Annual Inquiry Service List*,
88 Fed. Reg. 19,916 (Dep't Commerce Apr. 4, 2023)................................................................ 4

*Countervailing Duties, Final Rule*,
63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998).......................................................... 25

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

JOINT STOCK COMPANY APATIT,

Plaintiff,

and,

THE MOSAIC COMPANY,

Consolidated Plaintiff,

v.

UNITED STATES,

Defendant,

and,

THE MOSAIC COMPANY,

Defendant-Intervenor,

and,

JOINT STOCK COMPANY APATIT,

Consolidated Defendant-Intervenor.

Consol. Court No. 24-00226

**PUBLIC VERSION**

Business Proprietary Information removed from pages 29-31

**PLAINTIFF JOINT STOCK COMPANY APATIT'S RULE 56.2**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade ("CIT" or "the Court"), Plaintiff Joint Stock Company Apatit ("JSC Apatit") respectfully submits this memorandum in support of its Motion for Judgment on the Agency Record. JSC Apatit requests that this Court remand the *Final Results* of the second administrative review conducted by the U.S.

Department of Commerce ("Commerce" or the "Department") of its Countervailing Duty ("CVD") Order concerning Phosphate Fertilizers from the Russian Federation to Commerce with instructions to recalculate JSC Apatit's CVD margin. We demonstrate below that Commerce failed to meet its statutory and regulatory requirements in the *Final Results* such that its determination is unsupported by substantial evidence and otherwise not in accordance with law.

We first address the Department's unlawful findings with respect to the alleged provision of mining rights for phosphate rock for less than adequate remuneration ("LTAR") during the period of review ("POR"). Specifically, as this Court did in the appeal of the first administrative review of Commerce's order, this Court should again hold that Commerce's tier-three benchmark is not reflective of prevailing market conditions in Russia or consistent with market principles as required under 19 U.S.C. § 1677(5) and 19 C.F.R. § 351.511(a)(2)(iii), respectively, and is thus unlawful. Commerce failed to adopt a methodology that reasonably effectuated its governing statutory and regulatory purposes, and failed to rely on substantial evidence, when it excluded phosphate rock from sedimentary sources from its benchmark calculation. Moreover, Commerce again failed to calculate its CVD margin as accurately as possible with respect to the mining rights for LTAR program by excluding a third Harmonized System ("HS") code used for reporting phosphate rock exports from South Africa in its benchmark calculations.

We next address the Department's unlawful findings with respect to the alleged provision of natural gas for LTAR. In particular, Commerce unlawfully countervailed JSC Apatit's natural gas purchases from non-government authorities. In so doing, Commerce unlawfully ignored record evidence that JSC Apatit submitted and instead applied adverse facts available ("AFA") to the Government of Russia ("GOR") for its failure to provide information related to private independent gas producers. Commerce then relied on its AFA finding to unlawfully countervail

JSC Apatit's purchases of natural gas from independent gas producers, which are not government authorities in accordance with 19 U.S.C. § 1677(5)(B).

Accordingly, Commerce's *Final Results* were both unlawful and unsupported by substantial evidence, and this Court should remand with instructions to recalculate JSC Apatit's CVD margin consistent with the arguments set forth below.

## STATEMENT PURSUANT TO RULE 56.2

### I. Administrative Determination Under Review

The administrative determination under review is the final determination issued by Commerce in its second administrative review of its CVD order concerning Phosphate Fertilizers from Russia, Case No. C-821-825. *See Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,960 (Dep't Commerce Nov. 12, 2024) ("*Final Results*") (P.R. 287), and the accompanying Issues and Decision Memorandum ("Final IDM") (P.R. 283). 1/ The period of review is January 1, 2022, through December 31, 2022.

### II. Statement of the Issues

JSC Apatit respectfully asks this Court to render judgment on the agency record with respect to the following issues raised in JSC Apatit's Complaint, consistent with the legal arguments set forth below.

---

1/ References to public and confidential documents in the administrative record for this appeal are identified as "P.R." and "C.R.," respectively.

1. Whether Commerce failed to meet its statutory and regulatory obligations to select a "Tier Three" benchmark for Phosphate Rock reflective of prevailing market conditions and consistent with market principles. Commerce failed to act reasonably when it employed Global Trade Atlas Data solely for countries with igneous phosphate rock (Brazil, Finland, and South Africa), while ignoring more complete, accurate, and representative benchmark data available on the record from countries with sedimentary phosphate rock.

2. Whether Commerce unlawfully excluded from its Mining Rights benchmark the South Africa phosphate rock data reported in HS code 2835.26.

3. Whether Commerce unlawfully extrapolated GOR's AFA to JSC Apatit by countervailing JSC Apatit's natural gas purchases from independent gas producers/suppliers (*i.e.*, non-governmental authorities).

## STATEMENT OF FACTS

Commerce published its CVD order on phosphate fertilizers from Russia in the Federal Register on April 7, 2021. *Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ("CVD Order"). On April 4, 2023, Commerce published a notice of opportunity to request an administrative review of the CVD Order. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review and Join Annual Inquiry Service List*, 88 Fed. Reg. 19,916 (Dep't Commerce Apr. 4, 2023). On April 28, 2023, JSC Apatit and Industrial Group Phosphorite LLC ("Phosphorite") timely submitted a request for administrative review. Memorandum from James Maeder to Ryan Majerus, *Decision Memorandum for the Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2022: Phosphate Fertilizers from the Russian Federation* (Apr. 26, 2024)

at 2 (P.R. 254) ("*Preliminary Decision Memo*"). On April 28, 2023, the Mosaic Company (the "Defendant-Intervenor" or "Mosaic") also timely filed a request for review of the Order with respect to JSC Apatit and Phosphorite. *Id*. Commerce then initiated the second CVD administrative review on June 12, 2023. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021, 38,030 (Dep't Commerce June 12, 2023) (P.R. 12).

On July 11, 2023, Commerce selected JSC Apatit for individual review as a "mandatory respondent" and issued a CVD questionnaire to the Government of Russia ("GOR"), which was forwarded to JSC Apatit. Letter from the U.S. Department of Commerce to Anastasia Zimonina, *Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation: Countervailing Duty Questionnaire* (July 11, 2023) (P.R. 20–22). Also on July 11, 2023, Commerce notified all interested parties of its intent to rescind the review with respect to Phosphorite, which did not have a suspended entry within the period of review ("POR"). *Preliminary Decision Memo* at 2 (P.R. 254).

JSC Apatit timely submitted responses to Commerce's initial CVD questionnaire and supplemental questionnaires between August 1, 2023 to April 2, 2024. *Id*. On September 20, 2023, Mosaic requested verification of JSC Apatit's and the GOR's responses. *Id*.

JSC Apatit and Mosaic timely provided benchmark data to Commerce on February 16, 2024. Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: JSC Apatit's Benchmark Data Submission* (Feb. 16, 2024) ("JSC Apatit's Benchmark Submission") (P.R. 143-159; C.R. 189-206); Letter from Wilmer Cutler Pickering Hale and Dorr LLP to U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: Petitioner's Submission of Factual Information to Measure the Adequacy of Remuneration* (Feb. 16, 2024) ("Mosaic's Benchmark Submission") (P.R. 160–179). On

March 4, 2024, JSC Apatit and Mosaic both timely filed benchmark rebuttal data with Commerce. Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: JSC Apatit's Rebuttal Comments to Petitioner's Benchmark Data Submission* (Mar. 4, 2024) ("JSC Apatit's Benchmark Rebuttal Submission") (P.R. 188–199; C.R. 209–221); Letter from Wilmer Cutler Pickering Hale and Dorr LLP to U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: Petitioner's Benchmark Rebuttal Submission* (Mar. 4, 2024) ("Mosaic's Benchmark Rebuttal") (P.R. 200-225).

On May 2, 2024, Commerce published the Preliminary Results and assigned a preliminary CVD rate of 18.83 percent to JSC Apatit. *Phosphate Fertilizers from the Russian Federation: Preliminary Results and Partial Recission of the Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 35,794 (Dep't Commerce May 2, 2024) ("*Preliminary Results*") (P.R. 259). From June 14 to 18, 2024, Commerce verified the questionnaire responses that JSC Apatit submitted to Commerce in the administrative review. *Verification of the Questionnaire Responses of Joint Stock Company Apatit* (July 11, 2024) (P.R. 268; C.R. 269). On July 23, 2024, JSC Apatit and Mosaic timely filed case briefs. *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Case Brief* (July 23, 2024) (P.R. 275; C.R. 271); *Phosphate Fertilizers from the Russian Federation: Petitioner's Case Brief* (July 23, 2024) (P.R. 274; C.R. 270). On August 5, 2024, both JSC Apatit and Mosaic timely filed rebuttal case briefs. *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Rebuttal Case Brief* (Aug. 5, 2024) (P.R. 279; C.R. 272); *Phosphate Fertilizers from the Russian Federation: Petitioner's Rebuttal Brief* (Aug. 5, 2024) (P.R. 280; C.R. 273).

On November 6, 2024, Commerce assigned a final CVD rate of 18.21 percent to JSC Apatit in the final results of its review. *Final Results*, 89 Fed. Reg. at 88,961 (P.R. 287). Commerce failed to correct certain material errors in the *Preliminary Results*, as detailed below.

## SUMMARY OF THE ARGUMENT

Commerce's *Final Results* are both contrary to law and unsupported by substantial evidence. We explain below why Commerce (1) failed to select a lawful benchmark for the alleged phosphate rock for LTAR program; (2) unlawfully refused to make certain adjustments to its phosphate rock benefit calculations, resulting in an unlawful and inaccurate benefit being ascribed to JSC Apatit; and (3) unlawfully extrapolated the adverse facts available ("AFA") rate applied to the GOR to JSC Apatit by countervailing JSC Apatit's purchases of natural gas from independent producers. This Court should remand Commerce's unlawful decisions for further consideration, consistent with the standard of review and the legal principles and evidence set forth below.

## ARGUMENT

### I. STANDARD OF REVIEW

This Court "shall hold unlawful any determination" found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939). In making its judgment, the Court "reviews the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (citation omitted), and determines "whether

the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (citation omitted); *see also Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) ("We determine the existence of substantial evidence by considering the record as a whole, including {detracting evidence}") (citation omitted). "In order for Commerce's determination to be sustained, the determination must be reasonable, supported by the record as a whole, and the grounds that the administrative agency acted upon clearly disclosed." *Itochu Bldg. Prods., Co. v. United States*, 163 F. Supp. 3d 1330, 1333–34 (Ct. Int'l Trade 2016) (at minimum, this requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (citations omitted).

Commerce's determinations must also be consistent with the governing statute. Following the Supreme Court's decision in *Loper Bright Enterprises et al. v. Raimondo*, 603 U.S. 369 (2024), in which the Court overruled *Chevron, U.S.A., Inc. v. NRDC, Inc*, 467 U.S. 837 (1984), Commerce's interpretations of statutory provisions are not entitled to deference by this Court. Instead, "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the {Administrative Procedure Act ("APA")} requires." *Loper Bright*, 603 U.S. at 412. In other words, this Court determines not whether an agency's "reading {is} 'permissible' in such a case," *id.* at 373 (referencing *Chevron*, 467 U.S. at 843), but rather whether the agency's interpretation reflects "the best reading of the statute. . . ." *Id*. In so doing, "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires . . . {and} need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 412–13; *see also*

*Hyundai Steel Co. v. United States*, 798 F. Supp. 3d 1283, 1289 n.5 (Ct. Int'l Trade 2025) (citing *Loper Bright* in considering the lawfulness of a Commerce CVD determination).

Even before the Supreme Court's decision in *Loper Bright*, no deference was owed to Commerce when the intent of Congress was judicially ascertainable. *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881–82 (Fed. Cir. 1998). This requires the Court to "first carefully investigate the matter to {discern} Congress's purpose and intent on the question at issue." *Id.* at 881. In determining the plain meaning of statutory language, the Court is required to employ the traditional tools of statutory construction (*e.g.*, dictionary definitions, grammatical structure). *See*, *e.g.*, *Pesquera Mares Australes v. United States*, 266 F.3d 1372, 1382–83 (Fed. Cir. 2001). When appropriate, the Court will also consider legislative history to determine congressional intent. *Timex*, 157 F.3d at 882 (citing *Dunn v. Commodity Futures Trading Com'n*, 519 U.S. 465 (1997)).

## II. COMMERCE FAILED TO SELECT A LAWFUL PHOSPHATE ROCK BENCHMARK THAT IS REFLECTIVE OF PREVAILING MARKET CONDITIONS IN RUSSIA AND CONSISTENT WITH MARKET PRINCIPLES

This Court has ruled that Commerce must consider comparable sedimentary phosphate rock countries in its benchmark, and Commerce has implemented the Court's decision in both the remand results of the first administrative review of this case, as well as in its Final Results of the third administrative review of this case. *Archer Daniels Midland Company v. United States*, Consol. Court No. 23-00239, Slip Op. 26-92 at 6–13 (Ct. Int'l Trade Aug. 12, 2026) ("*AR1 Final Order*"); *Archer Daniels Midland Company v. United States*, 816 F. Supp. 3d 1371, 1375–1379 (Ct. Int'l Trade 2026) ( "*AR1 Second Remand Order*"); *Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 20,639 (Dep't Commerce Apr. 17, 2026) ("AR3 Final Results") and accompanying Issues and Decision Memorandum at cmt. 1c (calculating the benchmark without regard for geological origin

by including exports from Togo and Jordan). This Court should accordingly direct Commerce to do the same in this proceeding.

To find a countervailable subsidy, Commerce must establish that an authority provided a financial contribution and thereby conferred a benefit. *See* 19 U.S.C. § 1677(5)(B). In cases where goods or services are provided, a benefit is considered conferred if the goods or services are provided for less-than-adequate remuneration ("LTAR"). *See* 19 U.S.C. § 1677(5)(E)(iv). Adequacy of remuneration is determined in relation to prevailing market conditions for the good or service being provided in the country subject to the review. *See id*. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale. *See id*. Commerce determines the amount of the alleged subsidy by comparing remuneration actually paid with a market-determined price for the goods under a three-tiered hierarchy that Commerce employs to determine the appropriate remuneration benchmark. *See Changzhou Trina Solar Energy Co. v. United States,* 352 F. Supp. 3d 1316, 1332 (Ct. Int'l Trade 2018); *see also* 19 C.F.R. § 351.511(a)(2)(i)–(iii).

Beyond the bounds set forth in the statute, Commerce must also follow the regulatory hierarchy for selecting a benchmark price set forth in 19 C.F.R. § 351.511(a)(2). All parties agree that neither of the first two benchmarks are available on this record with respect to phosphate rock. *See* Final IDM at 11–12. Commerce thus was required to select a tier-three benchmark, which considers whether the government price in the country of provision of the good or service is "consistent with market principles." 19 C.F.R § 351.511(a)(2)(iii). Moreover, Commerce itself states that the regulation "does not prescribe a specific benchmark calculation methodology" but admits its selection discretion is not unbounded. It must be consistent with Commerce's obligation to calculate subsidy rates as accurately as possible. *See* Final IDM at 12 (citing *MacLean-Fogg*

*Co. v. United States*, 100 F. Supp. 3d 1349, 1356 (Ct. Int'l Trade 2015)). Thus, in this case, a lawful benchmark must (1) reasonably reflect the "prevailing market conditions" for the provision of mining rights—which Commerce has equated to cost of sales of phosphate rock—in Russia; (2) be consistent with market principles for phosphate rock; and (3) enable Commerce to calculate JSC Apatit's CVD margin as accurately as possible.

### A. This Court's Judgment in the First Administrative Review of the Same Proceeding Compels the Inclusion of Sedimentary Phosphate Rock Data in the Tier-Three Benchmark for This Review

In the *Final Results*, Commerce continued to "limit the benchmark to countries with igneous phosphate ore deposits as opposed to sedimentary deposits." Final IDM at 21. Commerce explained that in its view JSC Apatit did not provide sufficient evidence that the underlying costs for producing phosphate rock from both igneous and sedimentary deposit are the same despite differences in mining and beneficiation processes to compel Commerce to include phosphate rock prices from countries with sedimentary deposits (specifically, Togo and Jordan) in its benchmark calculation. *Id*. Commerce erroneously concluded that because its analysis "focuses on JSC Apatit's costs to mine and process phosphate ore into phosphate rock, any differences in the production process for phosphate rock from sedimentary deposits versus igneous deposits are relevant to our analysis." *Id*.

In the first administrative review of this proceeding, this Court directed Commerce to expand its phosphate rock benchmark to include phosphate rock from sedimentary sources. *AR1 Final Order* at 6–13; *AR1 Second Remand Order* at 1375–1379. This Court explained that "BPL content of phosphate rock, not whether the rock is produced from sedimentary or igneous ore, drives the prices in the phosphate rock market from whence the benchmark comes." *AR1 Second Remand Order* at 1378. Moreover, this Court highlighted that Commerce's benchmark

"reflect{ed} only a tiny percentage of global phosphate rock exports" which "unreasonably limited the benchmark to the price of phosphate rock known to be from igneous ore deposits." *Id*. at 1379. This Court further explained that "Mosaic has not shown that the only reasonable conclusion from the record evidence is that the phosphate rock market is significantly driven by the distinction between igneous- and sedimentary-origin phosphate rock in addition to BPL content." *AR1 Final Order* at 12.

Moreover, Commerce has now twice made the determination that BPL content, not geological origin, drives phosphate rock prices, and accordingly included comparable sedimentary phosphate rock in its benchmark construction: on remand in the first administrative review of this case, and in the third administrative review of this case. *Id.* at n. 6 (explaining that "Commerce did not reconstruct its benchmark because it was required to do so, but rather because the newly supplemented record suggested that BPL content is the main driver of world market prices for phosphate rock."); AR3 Final Results, 91 Fed. Reg. 20,639 and accompanying IDM at cmt. 1c.

The record in this review contains benchmark phosphate rock prices for Togo and Jordan, phosphate rock exporting countries with comparable BPL levels to Russian rock: $P_2O_5$ content of roughly 37.5%, or BPL over 78%. 2/ *See* Mosaic's Benchmark Submission at Exh. 21 (P.R. 179); JSC Apatit's Benchmark Submission at App. 9 (P.R. 152; C.R. 198). The other countries that Commerce has consistently compared to Russian rock report P2O5 content between 32.4-37% (a BPL level of between 70.7-83). Mosaic's Benchmark Submission at Exh. 21 (P.R. 179). Similarly, both Togo and Jordan export phosphate rock with a level of over 35.69% P2O5 or 78% BPL. JSC Apatit's Benchmark Submission at App. 9.2 (P.R. 152; C.R. 198). Accordingly, there

---

2/ Bone Phosphate of Lime ("BPL") content converts to $P_2O_5$ content at a ratio of 0.4576. *See* Mosaic's Benchmark Submission at Exh. 13.

is no new evidence on the record before this Court in this second administrative review that compels a different outcome from this Court's decision in the first administrative review. To the contrary, as discussed in more detail below, there is additional evidence supporting this Court's first review decision on this evidentiary record of this review. This Court has accordingly already ruled on the issue, and Commerce has twice agreed with the Court's decision. Therefore, the Court should remand to Commerce with instructions to include export prices from Togo and Jordan (the comparable sedimentary rock sources on the record) in the benchmark.

**B. Commerce Unlawfully Interpreted and Applied the Statutory Factors Set Forth in 19 U.S.C. § 1677(5)(E)(iv)**

Commerce's unlawful interpretation and application of the statutory factors set forth in 19 U.S.C. § 1677(5)(E)(iv) further demonstrates that this Court ruled correctly in the first administrative review proceeding and should do the same here. Commerce determined that ***only*** one prevailing market condition, "quality," is material to its Tier Three benchmark selection. Final IDM at 14. Commerce relies on its original investigation findings that any rock used as a benchmark must be (1) of the same ore type (*i.e.*, igneous) ***and*** (2) of the same $P_2O_5$ content/BPL level. *Id.* at 12. In so doing, it asserts that 19 U.S.C. § 1677(5)(E)(iv) identifies "quality" as a relevant factor, and that the type of ore is a "quality relevant for selecting comparable phosphate rock" that is material to its benefit analysis. *Id.*

The *Final Results* focus exclusively on the quality factor of the phosphate rock and willfully neglect the other factors set forth in 19 U.S.C. § 1677(5)(E)(iv)—that is, price, availability, marketability, transportation, and other conditions of sale. This was unlawful. Fundamental principles of statutory construction require that, because the relevant statutory test enumerates numerous factors—"price, quality, availability, marketability, transportation, and other conditions of purchase or sale"—Commerce must review all of those factors. The agency

failed to do so in its *Final Results*. Importantly, the Supreme Court has made clear that Commerce's interpretation and application of a governing statute is now subject to stricter scrutiny from a reviewing Court—the legal question is whether Commerce employed the "best reading of the statute." *Loper Bright*, 603 U.S. at 373 (2024). Commerce plainly failed to do so when it focused on ***only one of six*** (or more) required statutory factors, and when other benchmark data on the record would permit it to consider those other factors.

Moreover, Commerce's claimed quality analysis failed to look at quality as a whole, and instead looks only to one specific detail in regards to quality, leading the agency to contradict itself. Commerce stated its analysis of the "quality" factor considered two characteristics—the type of ore ***and*** the $P_2O_5$ content level—but then only accepts benchmark data pricing for phosphate rock mined from igneous deposits. Final IDM at 15. In practice, Commerce was not concerned that the $P_2O_5$ content level was the same.

Equally significant, Commerce failed to explain why none of the other statutory factors were relevant and can be ignored. This Court has rejected Commerce's weighing of one statutory factor over others in its tier-three analysis without proper explanation: "the record does not adequately explain why Commerce granted controlling weight to {one factor} in evaluating the {} benchmark data, while disregarding the other factors." *Risen Energy v. United States*, 570 F. Supp. 3d 1369, 1376 (Ct. Int'l Trade 2022). Commerce must correct its erroneous and unlawful focus on one statutory factor.

Finally, as detailed below, rock type (*i.e.*, sedimentary and igneous) does not prescribe all physical characteristics that Mosaic and Commerce claim to have an effect on pricing, and there is insufficient record evidence demonstrating otherwise. Rather, the record evidence demonstrates that any differences between type of rock or quality of rock are baked into prices—the very basis

for Commerce's benchmark price. *See* JSC Apatit's Benchmark Submission at App. 9 (P.R. 152; C.R. 198). Therefore, even if Commerce had interpreted and applied the statutory factors properly, its conclusions are neither factually accurate nor supported by record evidence.

In sum, Commerce's benchmark for the mining rights program is neither reflective of the prevailing market conditions in Russia nor consistent with market principles. Such a benchmark is *per se* unlawful. Moreover, Commerce's mining rights benchmark is not supported by substantial evidence on the underlying administrative review record. Specifically, JSC Apatit provided evidence demonstrating the unreliability of Commerce's benchmark and, in the alternative, requested that the benchmark be modified to be consistent with the governing statute and regulations. Commerce ignored both JSC Apatit's evidence and its requests for adjustments.

### C. Commerce's Selected Benchmark Cherry-Picked Data That Are Unrepresentative of the Phosphate Rock Market

The fundamentally flawed nature of Commerce's benchmark is apparent in the cherry-picked data it used to calculate a benchmark to produce a high CVD margin for JSC Apatit. Commerce's benchmark, comprising certain Global Trade Atlas IHS Markit ("GTA") export data for only Brazil, Finland, and South Africa in 2022, accounts for less than 0.38% of the total global production and less than 2.75% of the total global exports of phosphate rock in 2022. JSC Apatit's Benchmark Submission at App. 9 (P.R. 152; C.R. 198). Moreover, the three-country GTA data represents just 8.1% of the total GTA data on the record (including Togo, Jordan, and the third South Africa HS code)—in other words, the five-country GTA data (including the third HS South Africa code) is ***twelve times larger*** than the data upon which Commerce relied to make its determination. The chart below illustrates succinctly and starkly why the benchmark data relied on by Commerce are ***wholly unrepresentative*** of the phosphate rock market during 2022. *Compare* Memorandum from Shane Subler to The File *Countervailing Duty Administrative*

*Review of Phosphate Fertilizers from the Russian Federation: Final Results Calculations for Joint Stock Company Apatit*, (Nov. 5, 2024) (P.R. 284–285; C.R. 274–275) *with* JSC Apatit's Benchmark Submission at App. 9 (P.R. 152; C.R. 198).




### D. Commerce's Reliance on Global Trade Atlas Data That Excludes Sedimentary Rock Countries Was Unlawful

In the *Final Results*, Commerce relied on phosphate rock prices from South Africa, Finland, and Brazil to calculate a benchmark price. Final IDM at 19. Commerce again relied on its erroneous and arbitrary distinction between igneous and sedimentary rock to exclude Togo and Jordan phosphate rock prices on the record from its benchmark price calculation. Final IDM at 19–21. This Court's precedent from the first administrative review does not support this reasoning—and neither does the record in this review. To the contrary, record evidence demonstrates that the differences that Commerce identifies between igneous and sedimentary rock are either inherently factored into market pricing, or do not affect pricing. Moreover, Commerce excluded Togo and Jordan from its benchmark price as not "comparable" ***even though Mosaic requested that Commerce include Jordan (a sedimentary rock source) in its benchmark price in***

***its original petition***. *See* JSC Apatit's Benchmark Rebuttal at App. 21 (P.R. 192–193; C.R. 214). Commerce's decision is thus arbitrary and not supported by substantial evidence.

First, $P_2O_5$ content is a critical quality measure of phosphate rock. 3/ $P_2O_5$ content is inherently accounted for within the market pricing and trading of phosphate rock, making it irrelevant whether phosphate rock was imported from a country with comparable $P_2O_5$ content (upon which Commerce erroneously insists). Specifically, record evidence demonstrates that phosphate rock pricing is based on a market price, then formulaically adjusted to account for the $P_2O_5$ content level. *See* JSC Apatit's Benchmark Rebuttal at App. 26 (P.R. 193; C.R. 215). The $P_2O_5$ content level of phosphate rock determines how much rock must be consumed as an input in the production of phosphate fertilizer—in other words, the quality of the rock is thus inherently factored into the pricing and commercial negotiations for phosphate rock. *See id.* (demonstrating phosphate rock pricing is formulaically adjusted to account for the $P_2O_5$ content level). Like any other factor affecting the quality of a commodity, the $P_2O_5$ content is thus accounted for in commercial negotiations, along with supply and demand in the market. As such, identifying whether phosphate rock is imported from a country with a comparable $P_2O_5$ level is irrelevant when using a market price as a benchmark comparison.

Second, Commerce erroneously identified geological origin (*i.e.*, ore type) as a relevant factor for identifying a comparable phosphate rock benchmark. Commerce explained its flawed reasoning in the *Final Results*: "JSC Apatit did not cite any evidence that the underlying costs for producing phosphate rock from each type of deposit are the same despite {differences in mining and beneficiation processes for ore from each type of deposit}." Final IDM at 18. But this Court

3/ Notably Commerce determined that $P_2O_5$ content was the only other factor besides type of rock it will consider. *See* Final IDM at 11–12.

has correctly determined that beneficiation costs for phosphate rock are not relevant to phosphate rock pricing: "The record evidence indicates that the BPL content of phosphate rock, not whether the rock is produced from sedimentary or igneous ore, drives the prices in the phosphate rock market from whence the benchmark comes." *AR1 Second Remand Order* at 1378. Moreover, this Court explained that "if the product at issue were phosphate ore, then the costs of beneficiating igneous and sedimentary rock could impact the price for the ore. But the benchmark product is not ore—it is phosphate rock." *Id.* at 1379. Commerce's reliance on alleged differences in mining and beneficiation costs of phosphate ore from igneous versus sedimentary rock is accordingly misplaced, and it therefore has no reasoned explanation for its argument that geological origin of phosphate rock must be comparable for inclusion in a benchmark price. –

Accordingly, to make the benchmark price more reflective of prevailing market conditions and consistent with market principles in the Russian phosphate rock market, Commerce was obligated to include data from Togo and Jordan in its benchmark because these two countries' phosphate rock has comparable BPL levels to Russian phosphate rock. 4/ Russian rock has a $P_2O_5$ level between 37.5-40%. *See* Mosaic's Benchmark Submission at Exh. 21 (P.R. 162). Industry practice recognizes that BPL levels higher than 78 percent constitute the highest category of

---

4/ Phosphate rock from Jordan is also comparable with respect to other factors, including methods of processing and beneficiation, and levels of contaminants. *See* Mosaic's Benchmark Submission at Exh. 12 (P.R. 161) (identifying that igneous and sedimentary rock with siliceous gangue employ the same beneficiation method of flotation); JSC Apatit Benchmark Rebuttal at App. 32 (P.R. 194; C.R. 216) (demonstrating that Jordan has silicious gangue sedimentary phosphate rock that uses the same flotation beneficiation method that Russia uses for its igneous rock); Mosaic's Benchmark Submission at Exh. 16 (P.R. 162) (identifying that Russian phosphate rock has a cadmium level of roughly 1 mg/kg and Jordanian phosphate rock is as low as 3 mg/kg—a difference of just 1.3% of the practical cadmium content range of phosphate rock, which is up to 150 mg/kg); *id.* (demonstrating that phosphate rock from Jordan is well below the strictest European regulations of 20 mg/kg of cadmium).

phosphate rock. JSC Apatit's Benchmark Submission at App. 9 (P.R. 152; C.R. 198). Moreover, Mosaic itself has conceded that "Commercial phosphate rocks vary in grade from about 80 to 60 BPL," or roughly 27-37% $P_2O_5$ content. And the countries that Commerce included in its benchmark price calculation (Brazil, Finland, and South Africa) have $P_2O_5$ content ranging from 32.4-37%, or 70.7-83% BPL. *See* Mosaic's Benchmark Submission at Exh. 21 (P.R. 160–179).

Both Togo and Jordan export phosphate rock with a level of over 78% BPL or 35.69% $P_2O_5$. *See* JSC Apatit's Benchmark Submission at App. 9.2 (P.R. 152; C.R. 198). This is well within the range of rock that is competitive in the market and is comparable to Russian phosphate rock and the other phosphate rock benchmark countries. Notably, Mosaic used Jordan export pricing to calculate a benchmark in its original petition, remarking that Jordan has "a BPL quality most comparable to phosphate rock from Russia." JSC Apatit's Benchmark Rebuttal at App. 21 (P.R. 192–193; C.R. 214). Commerce was accordingly not permitted to discard this comparable phosphate rock pricing on the record from its benchmark price calculations.

Alternatively, the record also contains Eurostat data, which are similarly reflective of the prevailing market conditions in Russia and consistent with market principles because they constitute the phosphate rock import pricing for Europe during the POR. JSC Apatit's Benchmark Submission at App. 6 (P.R. 152; C.R. 198). Commerce could have alternatively relied upon these data for its benchmark price calculations, as they (1) reflect actual sale prices into Europe based on commercial negotiations and market principles; (2) comprise a representative market, given that JSC Apatit exports all of its phosphate rock to Europe; (3) the European market accounts for more than half of the world's imports of 35+% $P_2O_5$ content level phosphate rock, which is the quality of phosphate rock that Russia produces, *see* JSC Apatit's Benchmark Submission at App. 6 (P.R. 152; C.R. 198); and (4) the data include pricing information for all imports into Europe,

regardless of origin or phosphate rock type, as such distinctions are inherently accounted for in the marketplace. If this Court erroneously determines that Commerce need not include Togo and Jordan in its benchmark price calculations, it should alternatively remand for Commerce to rely on the similarly representative Eurostat data on the record. 5/

This Court has previously concluded that Commerce must consider comparable sedimentary-origin phosphate rock in its benchmark calculations for mining rights for LTAR—and Commerce has in both its remand results of the first administrative review and in the Final Results of the third administrative review of this case determined the same—and nothing in the facts of this review compel a different determination. Accordingly, this Court should remand to Commerce with instruction to reconstruct the benchmark calculation in accordance with the conclusion that BPL content (not geological origin) is the main driver of phosphate rock prices.

### E. Commerce Should Include All Exports from South Africa in its Benchmark Price

In the *Final Results*, Commerce considered exports from South Africa for only two HS codes for phosphate rock: HS 2510.10 and 2510.20. Final IDM at 22–23. Commerce brushed aside ample record evidence that a third HS code, HS 2835.26.90, should be include in the benchmark price, explaining that the record was not clear that HS 2835.26.90 "even covers

---

5/ Furthermore, the Eurostat data include Moroccan-origin phosphate rock. Morocco exports almost one-fifth of the world's phosphate rock and is the second largest exporter of phosphate rock of any country. *See* JSC Apatit's Benchmark Submission at App. 9.2 (P.R. 152; C.R. 198). Due to Morocco's prevalence in the world market for phosphate rock, the pricing and commercial negotiations for phosphate rock in Europe are based on Moroccan phosphate rock prices. *See* JSC Apatit's Benchmark Rebuttal at App. 26 (P.R. 193; C.R. 215) (demonstrating phosphate rock pricing is set according to a Morocco FOB price applicable at the time). Accordingly, relying upon the Eurostat data would helpfully account for the important role of Morocco in the phosphate rock market in its tier-three benchmark.

phosphate rock." *Id*. In so doing, Commerce blatantly ignored record evidence that South Africa exported nearly *half* of its phosphate rock under this separate harmonized schedule code—significantly skewing the average-unit price in Commerce's benchmark. *See* JSC Apatit's Benchmark Rebuttal at Apps. 36-42 (P.R. 197–199; C.R. 219–220) (discussed in more detail below). Commerce's benchmark incorrectly relied solely on the HS subheading description, ignoring copious record evidence demonstrating that the exports under HS 2835.26.90 were of the same type of phosphate rock and should be considered.

As an initial matter, the record in this review is fundamentally different than the record in the first administrative review. We acknowledge that this Court found as follows in the first administrative review:

> JSC has failed to show that the products described by these three subheadings are comparable. Given that subheadings 2510.10 and 2510.20 limit their scope to 'natural calcium phosphates' and subheading 2835.2690 does not mention the word 'natural,' Commerce reasonably concluded that 2835.2690 likely covers different products.

*Archer Daniels Midland Company v. United States*, 779 F. Supp. 3d 1349, 1359, n.10 (Ct. Int'l Trade 2025) ("*AR1 First Remand Order*"). But, the record in this review is starkly different—Commerce was provided extensive evidence that HS 2835.26.90 was being used by South African exporters to cover phosphate rock used in fertilizer applications. Accordingly, as set forth below, Commerce's contrary conclusion is arbitrary and not supported by substantial evidence

The record here demonstrates that there is an established reporting principle for export data that allows companies to report their products under a different HS code when they are one of few producers and doing so would protect the confidentiality of their export quantities and prices. *See* JSC Apatit's Benchmark Rebuttal at App. 41.1 (P.R. 198–199; C.R. 219–220) (demonstrating that the International Convention on the Harmonized Commodity Description and Coding System

obliges contracting parties to make publicly available its import and export trade statistics "to the extent that publication is not precluded for exceptional reasons such as commercial confidentiality or national security."); *id.* at App. 41.2 (P.R. 199; C.R. 220) (providing the United Nations International Merchandise Trade Statistics Concepts and Definitions 2010, which further discusses how international trade data can be suppressed by reporting under a different HS code). The record also shows that Foskor was the only exporter of phosphate rock from South Africa in 2022. *See* Mosaic's Benchmark Submission at Exh. 29 (P.R. 163) (showing that Foskor and Kropz are the only producers of phosphate rock in South Africa); JSC Apatit's Benchmark Rebuttal at App. 39 (P.R. 197; C.R. 219) (showing that Kropz made its first ever successful bulk shipment of phosphate rock in 2023). Accordingly, Foskor must have reported some of its exports of phosphate rock under a third HS code for statistical confidentiality purposes.

South Africa's reliance on this third code, HS 2835.26.90 could not be more evident given that the *exact* quantities reported as being exported from South Africa under this third code align with imports from South Africa to other countries reported under HS codes 2510.10 and 2510.20—as demonstrated in the images below. Specifically, South Africa reported exactly 55,000,000 kg of exports to Lithuania under HS code 2835.26.90 in January 2022, and in February 2022, Lithuania reported imports of exactly 55,000,000 kg under HS code 2510.20. JSC Apatit's Benchmark Rebuttal at App. 42.1, 42.3 (P.R. 198–199; C.R. 219–220). Similarly, South Africa reported exports to Japan of exactly 36,534,000 kg under HS 2835.26.90 in March 2022, and in April 2022, Japan reported imports of exactly 36,534,000 kg under HS 2510.20. *Id*. at App. 42.1, 42.5 (P.R. 199; C.R. 220).

That these phosphate rock exports from South Africa are reported in a third HS code is not surprising. As S&P Global (the company that owns Global Trade Atlas) confirms, confidentiality

suppression schemes can be identified through analyzing the import data of the reciprocal countries to see how they are reporting the goods in question: because confidentiality schemes are purely national, the exports at issue will not be reported under the third code for the countries that are importing them. *Id*. at App. 41.4 (P.R. 199; C.R. 220).

**South Africa Export Statistics**
Products: 28352690 (South Africa, NotSpecified) Other; Other
Quantity: Monthly Series through December 2022

| Rank | Trade Partner | Unit | Jan 2022 | Feb 2022 | Mar 2022 | Apr 2022 |
|---|---|---|---|---|---|---|
| | World | KG | 110,017,886 | 30,557,525 | 80,602,056 | 27,507,519 |
| 1 | Zambia | KG | 770 | 35,180 | | 47,345 |
| 2 | Zimbabwe | KG | 8,616 | | | 74,000 |
| 3 | Eswatini | KG | | 8 | 15 | 5 |
| 4 | Botswana | KG | | 68,000 | 68,000 | 256,019 |
| 5 | Namibia | KG | | 217 | | 100 |
| 6 | Tanzania | KG | | 10 | | 50 |
| 7 | Taiwan | KG | | | | |
| 8 | Spain | KG | | | | |
| 9 | Saudi Arabia | KG | | | | |
| 10 | Netherlands | KG | 55,000,000 | | 44,000,000 | 27,100,000 |
| 11 | Mozambique | KG | | | | |
| 12 | Mauritius | KG | | | 41 | |
| 13 | Malawi | KG | 8,500 | | | 30,000 |
| 14 | Lithuania | KG | 55,000,000 | | | |
| 15 | Japan | KG | | | 36,534,000 | |
| 16 | India | KG | | 30,405,260 | | |
| 17 | Ghana | KG | | | | |
| 18 | Congo, Dem. Rep. | KG | | 7,000 | | |
| 19 | Belgium | KG | | 41,850 | | |

Source of data: South African Revenue Service
© 2024 S&P Global
Created on Thu 29 Feb 2024, 4:16 PM EST (21:16 GMT)

**Japan Import Statistics from South Africa**
Products: 251020 (Natural Calcium Phosphates, Natural Aluminum Calcium Phosphates And Phosphatic Chalk, Ground),
Quantity: Monthly Series through December 2022

| Rank | Trade Partner | Unit | Jan 2022 | Feb 2022 | Mar 2022 | Apr 2022 | May 2022 |
|---|---|---|---|---|---|---|---|
| 1 | South Africa | KG | | | | 36,534,000 | |

Source of data: Japan Ministry of Finance
© 2024 S&P Global
Created on Thu 29 Feb 2024, 4:15 PM EST (21:15 GMT)

**Lithuania Import Statistics from South Africa**
Products: 251020 (Natural Calcium Phosphates, Natural Aluminum Calcium Phosphates And Phosphatic Chalk, Ground),
Quantity: Monthly Series through December 2022

| Rank | Trade Partner | Unit | Jan 2022 | Feb 2022 | Mar 2022 | Apr 2022 | May 2022 |
|---|---|---|---|---|---|---|---|
| 1 | South Africa | KG | | 55,000,000 | | | |

Source of data: Eurostat
© 2024 S&P Global
Created on Thu 29 Feb 2024, 4:16 PM EST (21:16 GMT)

Additional evidence from the South African Trade and Industrial Policies Tracker for Q1 2022 discusses Lithuanian imports of South African phosphate rock for fertilizer that was exported under HS category 2835.26. JSC Apatit's Benchmark Rebuttal at App. 42.4, PDF p. 10–11 (P.R. 199; C.R. 220). Specifically, the publication describes the industrial applications of calcium phosphates under HS 2835.26.90 as including production of "fertilisers" and explains that there has been an "increase in calcium phosphates exports" from South Africa "due to the elevated demand for the product from Netherlands and Lithuania . . . Lithuania's increased demand for calcium phosphates is likely for the use of fertilisers. This is because one of the largest phosphate fertilizer manufacturers in Europe – AB Lifosa – is located in Lithuania." *Id.*

Commerce claims that it "acknowledged" the record evidence of the aligned import and export volumes reported under HS codes 2510.20 and 2835.26.90—but it erroneously stated that "JSC Apatit provided no specific information on the products that HS subheading 2835.2690 covers" and therefore wrongly concluded: "Given the lack of record information on the products covered by HS subheading 2835.2690, we cannot conclude that South Africa's exports under HS code 2835.2690 are exports of 'comparable phosphate rock' to what JSC Apatit produces in Russia." Final IDM at 23. Commerce is simply incorrect. As discussed above, JSC Apatit did provide specific information on the products that HS subheading 2835.2690 covers—including demonstrating that this product, exported from South Africa, was used for fertilizer production in Lithuania (who reported it as imported under 2510.20). *See* JSC Apatit's Benchmark Rebuttal at App. 42.1, 42.4–42.5 (P.R. 199; C.R. 220). Commerce's blatant disregard of the record evidence and subsequent failure to include the third HS code for exports from South Africa was accordingly unlawful.

## III. COMMERCE UNLAWFULLY COUNTERVAILED JSC APATIT'S NATURAL GAS PURCHASES FROM INDEPENDENT GAS PRODUCERS

Commerce's *Final Results* also erred by countervailing certain of JSC Apatit's purchases of natural gas from independent producers/suppliers—which are not "government authorities" under the statute. *See* Final IDM at 33–35. This decision was both contrary to law and unsupported by substantial evidence and should be remanded to Commerce for further consideration.

In order for a subsidy to be countervailable by Commerce, the subsidy must be provided by a "government authority." 19 U.S.C. § 1677(5)(B). The governing statute defines an authority as "a government of a country or any public entity within the territory of the country." *Id*. The actions of non-governmental entities are not countervailable, absent evidence that the entity has been directed or controlled by a government. Commerce treats firms that are owned by a government as "authorities." *See Countervailing Duties, Final Rule*, 63 Fed. Reg. 65,348, 65,402 (Dep't Commerce Nov. 25, 1998). Only "*where it is unclear whether a firm is an authority based on ownership information alone*," can Commerce consider other factors. *Guangdong Wireking Housewares & Hardware Co. v. United States*, 900 F. Supp. 2d 1362, 1376 (Ct. Int'l Trade 2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014) (citations omitted; emphasis added).

We acknowledge that this Court previously upheld Commerce's conclusion that JSC Apatit's natural gas producers/suppliers were government authorities, based on facts available with an adverse inference. *AR1 First Remand Order* at 1363–1365. 6/ This Court explained that Commerce reasonably determined that the evidence that JSC submitted was not sufficient to fill

---

6/ JSC Apatit respectfully disagrees with this Court's opinion in the appeal of the first administrative review in this regard, but nevertheless sets forth in this brief the compelling new record evidence on the record of this second administrative review, and preserves its rights to appeal this conclusion.

the gap in the record created by the Government of Russia's non-cooperation. *Id.* at 23. In other words, JSC Apatit failed to provide information that "speak{s} to each level of ownership between the supplier and its ultimate ownership." *Id.*

Commerce reached the same determination in this second administrative review, concluding that JSC Apatit – (1) *cannot* provide information in lieu of the GOR's failure to respond, and (2) failed to "provide the detailed information regarding each level of ownership between the supplier and its ultimate ownership as requested in the Input Producer Appendix." Final IDM at 34. In reaching this conclusion, however, Commerce failed entirely to consider the ***new*** record evidence before it. Specifically, JSC Apatit did supply information to Commerce addressing "each level of ownership." Accordingly, this Court should make a different finding in this appeal.

### A. Commerce Erred in Concluding That JSC Apatit Could Not Fill the Gap in the Record Left by the Government of Russia

As an initial matter, Commerce erred in concluding that "JSC Apatit cannot simply provide other information in lieu of the GOR's failure to respond." Final IDM at 34. Commerce may only apply AFA if – (1) necessary information is not available on the record, or (2) a party withholds information, fails to provide requested information by the deadline, significantly impedes a proceeding, or provides unverifiable information. 19 U.S.C. § 1677e(a). If one of these criteria is met, Commerce may apply an adverse inference if a party has also failed to cooperate to the best of its ability. 19 U.S.C. § 1677e(b) 7/

---

7/ This Court has confirmed this reading of the statute. *See Changzhou Trina Solar Energy Co. v. United States*, 359 F. Supp. 3d 1329, 1338 (Ct. Int'l Trade 2019) (AFA may only be used to fill gaps necessary to complete the factual record and ultimately to "find that the elements of

Specific requirements must be met in order for Commerce to apply AFA to a cooperating party when its government has failed to cooperate. In particular, Commerce must: (1) define the gap in the record by explaining exactly what information is missing from the record that would be necessary to verify non-use of a program; (2) establish how the withheld information creates this gap by explaining why the information the government refused to provide was necessary to verify claims of non-use; and (3) show that only the withheld information can fill the gap by explaining why other information that is on the record or accessible by respondents is insufficient or impossible to verify. *See Changzhou Trina Solar Energy Co.*, 352 F. Supp. at 1326–27 (Ct. Int'l Trade 2018) (instructing Commerce to explain specifically why the information the Government of China withheld created a gap that resulted in the use of AFA); *Guizhou Tyre*, 399 F. Supp. 3d at 1352–53 (remanding for Commerce to explain why verification was not possible); *Guizhou Tyre Co., Ltd. v. United States,* 523 F. Supp. 3d 1312, 1361 (Ct. Int'l Trade 2021) (applying the same three step rule).

Moreover, the application of AFA to a non-cooperative government may lawfully be extrapolated to a fully cooperative respondent only as a last resort. *See, e.g., GPX Int'l Tire Corp. v. United States*, 942 F. Supp. 2d 1343, 1348 & n.2, 1362 (Ct. Int'l Trade 2013) (ordering remand for Commerce to use neutral facts available, instead of extrapolating AFA from the non-cooperating government to the cooperating respondent); *Changzhou Trina,* 352 F. Supp. 3d at 1326–27 (rejecting application of AFA to a respondent company regarding its alleged use of

---

the statute have been satisfied."); *Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346, 1349 (Ct. Int'l Trade 2019) ("So when a government respondent does not cooperate with the Department's questionnaires—as here—a gap in the record *may* exist; but the Department cannot rely solely on the government's failure to comply in order to invoke AFA without first identifying such a gap.").

Export Buyers' Credit Program ("EBCP") and explaining that "use of facts available allows Commerce to render determinations when information is missing and it may use an adverse inference if respondents fail to cooperate, but {Commerce} is not permitted to skip either of these steps on the way to use of AFA"); *Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1356 (Ct. Int'l Trade 2019) (requiring Commerce to consider any information actually submitted by cooperating respondents).

Commerce's meek assertion that JSC Apatit is ***unable*** to provide the information in lieu of the GOR does not justify Commerce's application of AFA in an unlawful manner that adversely impacts JSC Apatit. Commerce cannot so easily sidestep the legal test established by the Court and the Federal Circuit in circumstances where cooperative respondents like JSC Apatit have filled the alleged gap in Commerce's record. In fact, this Court has explained that where respondents provided certified information to fill a factual gap left by a government and Commerce still finds the evidence not to have sufficiently filled that gap, Commerce was required to provide the respondents with an "opportunity to supplement the record." *Risen Energy Co. v. United States*, 658 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade 2023). Thus, at minimum, Commerce should have provided JSC Apatit with the opportunity to provide supplemental information if Commerce believed the substantial ownership information supplied by JSC Apatit was insufficient. Moreover, when record information could fill the gaps resulting from another party's non-cooperation, Commerce must first attempt to verify that information before it can apply AFA so as to harm the cooperating party (here JSC Apatit). *See Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335, 1342 (Ct. Int'l Trade 2019) (ordering Commerce "to pursue verification of the nonuse affidavits on record from the Plaintiffs; otherwise, as it stands, the Department's use of adverse facts available to impute use of the EBCP is unlawful on the record of this case").

Commerce never sought to verify the ownership of **[ ]**—on the contrary, as just explained, Commerce never even asked JSC Apatit for additional ownership information. Commerce's decision to dismiss JSC Apatit's uncontradicted evidence was contrary to law and not supported by substantial evidence. Therefore, this Court should remand this issue back to Commerce.

**B. Commerce Unlawfully Concluded That the Information JSC Apatit Provided Is Insufficient to Fill the Gap Left by the Input Producer Appendix**

The record evidence supplied by JSC Apatit is sufficient to fill the gap left by the GOR, and Commerce erred in finding to the contrary. Commerce applied AFA to the GOR for failing to respond to Commerce's input appendix. Final IDM at 33–35. Relying on its AFA finding, Commerce then found that **[ ]** are government authorities and countervailed JSC Apatit's purchases of natural gas from these private firms. Commerce's actions were both unsupported by record evidence and contrary to law.

JSC Apatit provided detailed information regarding its natural gas purchases made during the POR. Specifically, JSC Apatit identified and listed all of its purchases from independent gas producers **[ ]**. *See* Response from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Affiliation and Section III Supplemental Questionnaire Response*, (Apr. 1, 2024) ("JSC Apatit's SQR") at Exh. S-12 (P.R. 242; C.R. 251). Moreover, JSC Apatit demonstrated to Commerce that these **[ ]** companies were not "government authorities" in accordance with 19 U.S.C. § 1677(5)(B). Specifically, JSC Apatit's Initial Questionnaire Response ("IQR") at Exhibit 38 provides the ownership information at "each level" and for each of the independent gas suppliers, demonstrating that they are not government authorities, and therefore that their sales to

JSC Apatit are not countervailable. Response from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Section III of Initial Questionnaire* at Exh. 38, (Sep. 22, 2023) ("JSC Apatit's Sec. III IQR") (P.R. 71–72; C.R. 50).

This Court should look skeptically on Commerce's claim that the ownership information pertaining to **[** **]** was insufficient. Final IDM at 34. To the contrary, JSC Apatit submitted detailed evidence demonstrating exactly what Commerce said was missing—the ownership structure of its independent gas producers/suppliers. *See* JSC Apatit's Sec. III IQR at Exh. 38 (P.R. 71–72; C.R. 50). Specifically, JSC Apatit provided Commerce with these firms' direct and total ownership percentages, their current and historical shareholders, and their respective ownership percentages. *Id.* at PDF pg. 42 (detailing the ownership structure of **[** **]**); PDF pg. 48 (providing the current and historical shareholders and their ownership percentages for **[** **]**); PDF pg. 133 (detailing the ownership structure of **[** **]**); PDF pp. 137–138 (providing the current and historical shareholders and their respective ownership percentages for **[** **]**); PDF pg. 161 (detailing the ownership structure of **[** **]**); PDF pp. 164–165 (providing the current and historical shareholders and their respective ownership percentages for **[** **]**); PDF pp. 316, 324–327, 355–362 (providing the current and previous shareholders of **[** **]**); PDF pg. 420 (detailing the ownership structure of **[** **]**); PDF pp. 422–424 (providing the current and historical shareholders and their respective ownership percentages for **[** **]**). JSC Apatit

identified the ultimate owners of **[ ]** and demonstrated that no single government entity owns a controlling stake (*i.e.*, more than 50.01%) in **[ ]** supplier by providing the suppliers' Orbis reports. Commerce's refusal to assess the record evidence demonstrating that these companies are not government authorities was unlawful and not supported by substantial evidence.

Nor, as discussed above, did Commerce request from JSC Apatit what (if any) additional information it required, following JSC Apatit's fulsome submission, to show that JSC Apatit's independent gas suppliers were not government authorities under the statute. *Cf.*, 19 U.S.C. § 1677m(d) (requiring Commerce to allow respondents to correct deficient submissions before applying AFA); 19 U.S.C. § 1677m(e) (requiring Commerce to use information in deficiency responses so long as it meets criteria for reliability). This further undermines Commerce's decision.

In sum, JSC Apatit fully responded to Commerce's information and data requests, filling the hole in the record created by the GOR's failure to submit certain information. Commerce's decision to dismiss JSC Apatit's uncontradicted evidence was contrary to law and not supported by substantial evidence. 8/ Therefore, this Court should remand this issue back to Commerce to consider again the ownership evidence supplied by JSC Apatit and to ask for further information if so required.

---

8/ This Court's conclusion on this issue in JSC Apatit's prior appeal rested on a finding that JSC Apatit failed sufficiently to fill the gap in the record. *AR1 First Remand Order* at 1364-65. As set forth above, JSC Apatit demonstrated to Commerce that it sufficiently filled the gap in the record at issue here.

## CONCLUSION

For these reasons, JSC Apatit respectfully requests that this Court grant JSC Apatit's Motion for Judgment on the Agency Record and remand the *Final Results* to Commerce with instructions to recalculate JSC Apatit's CVD margin consistent with the arguments set forth above.

Respectfully submitted,

/s/ Jonathan T. Stoel
H. Deen Kaplan
Jonathan T. Stoel
Maria A. Arboleda

HOGAN LOVELLS
CADWALADER US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.6634
Fax: +1.202.637.5910
E-mail: jonathan.stoel@hlc.com

*Counsel to JSC Apatit*

Dated: September 11, 2026

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Hogan Lovells Cadwalader US LLP hereby certifies that the foregoing brief complies with the word-count limitation in the Standard Chambers Procedure. This brief contains 9,062 words according to the word-count function of the word-processing software used to prepare the brief. This is less than the 14,000 words permitted for Plaintiff briefs.

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel

HOGAN LOVELLS
CADWALADER US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hlc.com

September 11, 2026