**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| **JOINT STOCK COMPANY APATIT,**<br><br>**Plaintiff,**<br><br>**and**<br><br>**THE MOSAIC COMPANY,**<br><br>**Consolidated Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br>**Defendant,**<br><br>**and**<br><br>**THE MOSAIC COMPANY,**<br><br>**Defendant-Intervenor,**<br><br>**and**<br><br>**JOINT STOCK COMPANY APATIT,**<br><br>**Consolidated Defendant-Intervenor.** | **Consol. Court No. 24-00226** |

**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF THE MOSAIC COMPANY**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Consolidated Plaintiff and Defendant-Intervenor The Mosaic Company ("Mosaic") respectfully moves for judgment on the administrative record on the issue raised in its Complaint challenging the U.S. Department of Commerce's ("Commerce") final results of the second administrative review of the countervailing duty order on phosphate fertilizers from the Russian Federation. *See*

*Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,960 (Dep't Commerce Nov. 12, 2024) ("Final Results"), and accompanying Issues and Decision Memorandum.

For the reasons set forth in the accompanying memorandum, Commerce's determination is unreasonable, not supported by substantial evidence on the record, and otherwise not in accordance with law. Accordingly, Mosaic respectfully requests that the Court remand to Commerce with instructions to correct the errors identified by the Court; and grant such other or further relief that the Court deems just and proper.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Min Seong Kim
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: September 11, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

**JOINT STOCK COMPANY APATIT,**

**Plaintiff,**

**and**

**THE MOSAIC COMPANY,**

**Consolidated Plaintiff,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**THE MOSAIC COMPANY,**

**Defendant-Intervenor,**

**and**

**JOINT STOCK COMPANY APATIT,**

**Consolidated Defendant-Intervenor.**

**Consol. Court No. 24-00226**

**ORDER**

Upon consideration of Consolidated Plaintiff and Defendant-Intervenor the Mosaic Company's Rule 56.2 Motion for Judgment on the Agency Record, and the Memorandum in Support of the Mosaic Company's Rule 56.2 Motion for Judgment on the Agency Record, and all other papers and proceedings herein, it is hereby

**ORDERED** that Mosaic's motion is granted; it is further

**ORDERED** that the determination of the U.S. Department of Commerce ("Commerce") in *Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,960 (Dep't Commerce Nov. 12, 2024), is unreasonable, not supported by substantial evidence, and otherwise not in accordance with law; and it is further

**ORDERED** that the matter is remanded to Commerce for further consideration consistent with this opinion.

**SO ORDERED.**

____________________________
Jane A. Restani, Judge

Dated: ____________________
New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

**JOINT STOCK COMPANY APATIT,**

**Plaintiff,**

**and**

**THE MOSAIC COMPANY,**

**Consolidated Plaintiff,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**THE MOSAIC COMPANY,**

**Defendant-Intervenor,**

**and**

**JOINT STOCK COMPANY APATIT,**

**Consolidated Defendant-Intervenor.**

**Consol. Court No. 24-00226**

**MEMORANDUM IN SUPPORT OF CONSOLIDATED PLAINTIFF AND DEFENDANT-INTERVENOR THE MOSAIC COMPANY'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

David J. Ross
Stephanie E. Hartmann
Min Seong Kim
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

Dated: September 11, 2026

*Counsel for The Mosaic Company*

**TABLE OF CONTENTS**

**I. INTRODUCTION** ... 1

**II. RULE 56.2 STATEMENT** ... 1

**A. Administrative Decision Under Review** ... 1

**B. Issues Presented and Summary of Arguments** ... 1

**1. Whether Commerce's selection of Kazakh export prices to measure the adequacy of remuneration for natural gas is unreasonable, not supported by substantial evidence, and otherwise not in accordance with law.** ... 1

**III. STATEMENT OF FACTS** ... 2

**A. The Preliminary Phase of Commerce's Administrative Review** ... 2

**B. Commerce's Preliminary Results** ... 4

**C. Commerce's Final Results** ... 9

**IV. STANDARD OF REVIEW** ... 10

**V. ARGUMENT** ... 12

**A. Commerce's Selection of Kazakh Export Prices as a Tier Two Benchmark for Natural Gas is Unreasonable, Not Supported by Substantial Evidence, and Otherwise Not in Accordance With Law** ... 12

**1. Commerce's Legal Framework for Measuring the Adequacy of Remuneration Paid for Government-Provided Goods and Services** ... 13

**2. Kazakh Export Prices Are Not a Suitable Benchmark Because the Raw Kazakh Gas is a Different Product Than the Refined Russian Gas Provided for Less Than Adequate Remuneration** ... 14

**3. Kazakh Export Prices Are Not World Market Prices That Would Be Available to Purchasers in Russia Within the Meaning of 19 C.F.R. § 351.511(a)(2)(ii)** ... 16

**4. The Kazakh Export Prices Are Not Reliable and Cannot Serve as a Tier Two Benchmark** ... 20

**5. The Kazakh Export Prices Sourced from BNS Are Not Suitable as a Tier Two Benchmark Because All Kazakh Gas Prices Are Distorted by Government Involvement in the Market** ... 21

**VI. CONCLUSION** ... 23

## TABLE OF AUTHORITIES

**Statutes, Rules, and Regulations**

19 C.F.R. §§ 351.511 ........ *passim*

19 U.S.C. § 1516a(b)(1)(B)(i)........ 11

19 U.S.C. § 1677........ 12, 13, 14, 21

Administrative Procedure Act........ 11

Tariff Act of 1930........ 13

**Cases**

*Acciai Speciali Terni, S.p.A. v. United States*,
26 C.I.T. 892 (CIT 2002)........ 11

*Archer Daniels Midland Co. v. United States*,
779 F. Supp. 3d 1349 (CIT 2025)........ passim

*Archer Daniels Midland Co. v. United States*,
No. 23-00239, 2026 WL 323717 (CIT Feb. 6, 2026)........ 15, 16

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*,
419 U.S. 281 (1974)........ 11

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)........ 11

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
701 F.3d 1367 (Fed. Cir. 2012)........ 11

*CS Wind Viet. Co. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016)........ 11, 18

*Jiaxing Brother Fastener Co. v. United States*,
380 F. Supp. 3d 1343 (CIT 2019)........ 11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........ 11

*NMB Sing. Ltd. v. United States*,
557 F.3d 1316 (Fed. Cir. 2009)........ 12

*RHP Bearings Ltd. v. United States*,
288 F.3d 1334 (Fed. Cir. 2002)........ 11

*Rust v. Sullivan*,
500 U.S. 173 (1991) ... 11

*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996) ... 11

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) ... 11

*Zhejiang DunAn Hetian Metal Co. v. United States*,
34 C.I.T. 408 (2010), *vacated on other grounds*, 652 F.3d 1333 (Fed. Cir. 2011) ... 12

**Administrative Determinations**

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 88 Fed. Reg. 19,916 (Dep't Commerce Apr. 4, 2023) ... 2

*Phosphate Fertilizers From the Russian Federation: Final Results of Redetermination Pursuant to Court Remand, Archer Daniels Midland Co. v. United States,* No. 23-00239, Slip Op. 25-55 (Dep't Commerce Aug. 4, 2025) ... 12, 19

*Certain Softwood Lumber Products From Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review, 2020*, 87 Fed. Reg. 48,455 (Dep't Commerce Aug. 9, 2022), and accompanying Issues and Decision Memorandum ... 21

*Certain Uncoated Groundwood Paper From Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Dep't Commerce Aug. 9, 2018), and accompanying Issues and Decision Memorandum ... 22

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ... 16

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021 (Dep't Commerce June 12, 2023) ... 2

*Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ... 2

*Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,960 (Dep't Commerce Nov. 12, 2024) ... *passim*

*Phosphate Fertilizers From the Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 35,794 (Dep't Commerce May 2, 2024), and accompanying Preliminary Decision Memorandum ......................................................3, 4

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020).........................................................................23

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part; 2016*, 83 Fed. Reg. 63,472 (Dec. 10, 2018).............................................23

## I. INTRODUCTION

On behalf of Consolidated Plaintiff and Defendant-Intervenor The Mosaic Company ("Mosaic"), we submit this brief in support of Mosaic's Rule 56.2 motion for judgment on the agency record.

## II. RULE 56.2 STATEMENT

### A. Administrative Decision Under Review

Mosaic challenges certain aspects of the final determination by the U.S. Department of Commerce ("Commerce") in the second administrative review of the countervailing duty ("CVD") order on phosphate fertilizers from the Russian Federation ("Russia") for the period January 1, 2022 to December 31, 2022. The final results were published in the Federal Register on November 12, 2024. *Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,960 (Dep't Commerce Nov. 12, 2024), P.R. No. 287 ("Final Results"), and accompanying Issues and Decision Memorandum, P.R. No. 283, ECF No. 5 ("IDM").

### B. Issue Presented and Summary of Arguments

#### 1. Whether Commerce's selection of Kazakh export prices to measure the adequacy of remuneration for natural gas is unreasonable, not supported by substantial evidence, and otherwise not in accordance with law.

Yes. Commerce's selection of Kazakh export prices as a tier two benchmark for the Provision of Natural Gas for Less Than Adequate Remuneration ("LTAR") program was unreasonable, not supported by substantial evidence, and otherwise not in accordance with law. Commerce's finding that Kazakh export prices are "available to" purchasers in Russia, and therefore that such prices may serve as a viable tier two benchmark, is inconsistent with its regulations and not supported by the record evidence. Further, Commerce failed to meaningfully

address Mosaic's arguments that the Government of Kazakhstan's ("GOK") involvement in the market distorts Kazakh export prices, rendering them unusable as a tier two benchmark.

## III. STATEMENT OF FACTS

### A. The Preliminary Phase of Commerce's Administrative Review

On April 7, 2021, Commerce published a CVD order on phosphate fertilizers from Russia. *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) (the "Order"). On April 4, 2023, Commerce published a notice of opportunity to request an administrative review of the Order. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 88 Fed. Reg. 19,916 (Dep't Commerce Apr. 4, 2023). On April 28, 2023, PhosAgro Public Joint Stock Company, its wholly owned subsidiary Joint Stock Company Apatit, and its affiliated exporter PhosAgro Trading SA (collectively, "JSC Apatit") submitted a request for administrative review. Letter from Hogan Lovells LLP, re: "Request for Review – 2022 Countervailing Duty Review Period" (Apr. 28, 2023), P.R. No. 2. On April 28, 2023, Mosaic submitted a timely request that Commerce conduct an administrative review with respect to Industrial Group Phosphorite LLC, a member of the EuroChem Group, and JSC Apatit, a member of the PhosAgro Group. Letter from Wilmer Cutler Pickering Hale and Dorr LLP, re: "Phosphate Fertilizers From Russia: Request for Countervailing Duty Administrative Review" (April 28, 2023), P.R. No. 1.

On June 12, 2023, Commerce initiated a countervailing duty administrative review of the Order for JSC Apatit and EuroChem for the period of review ("POR") January 1, 2022, through December 31, 2022. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021 (Dep't Commerce June 12, 2023), P.R. No. 12. Commerce selected JSC

Apatit for individual examination and eventually rescinded the review with respect to EuroChem. *See Phosphate Fertilizers From the Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 35,794 (Dep't Commerce May 2, 2024) ("Preliminary Results"), P.R. No. 259, and accompanying Preliminary Decision Memorandum at 1, P.R. No. 254 ("PDM").

The GOR and JSC Apatit submitted responses to the initial countervailing duty questionnaire on September 22, 2023. Response from Ministry of Economic Development of the Russian Federation, IQR – Cover Ltr. & Narrative (Sept. 22, 2023), P.R. No. 76, C.R. No. 158; Response from Hogan Lovells LLP, JSC Apatit Sec III QR - Narrative (Sept. 22, 2023), P.R. No. 52, C.R. No. 6 ("JSC Apatit IQR"). In its initial questionnaire response ("IQR"), JSC Apatit confirmed it purchased natural gas from Gazprom, a Russian governmental entity that controls the Russian gas pipeline system. JSC Apatit IQR at 39-42, P.R. Nos. 72-73, C.R. No. 31; *id.*, Exhibits 39-40, P.R. Nos. 72-73, C.R. No. 77.

Commerce issued supplemental questionnaires to the respondents between February 28, 2024 and March 11, 2024, and the respondents submitted responses to these supplemental questionnaires between March 15, 2024 and April 1, 2024. *See* Response from Hogan Lovells LLP, JSC Apatit Affiliation & Sec III Suppl QR (Apr. 1, 2024), P.R. No. 241, C.R. No. 229; Response from Ministry of Economic Development of the Russian Federation, GOR Suppl QR - Narrative (Mar. 15, 2024), P.R. No. 234, C.R. No. 226.

Mosaic submitted all necessary information for Commerce to calculate benchmarks for the natural gas for LTAR program. This included 2022 export volume and value data for harmonized tariff schedule ("HTS") headings 2510.10 and 2510.20 sourced from the International Energy Agency ("IEA"), European OECD natural gas price data for industrial

purposes retrieved from the IEA's database of energy prices and taxes for OECD countries, and information from the IEA on energy conversion ratios for natural gas. *See* Letter from Wilmer Cutler Pickering Hale and Dorr LLP, Petitioner Benchmark (Feb. 16, 2024) ("Mosaic Benchmark Submission"), Exhibits 39-42, P.R. No. 171-73. JSC Apatit submitted Kazakh natural gas export prices under customs classification code 2711.21.0000 sourced from the Bureau of Natural Statistics ("BNS") of the Agency for Strategic Planning and Reforms of the Republic of Kazakhstan. Letter from Hogan Lovells, JSC Apatit Benchmark – Appendix 1 (Feb. 16, 2024) ("JSC Apatit Benchmark Submission") at Appendix 1, P.R. No. 144, C.R. No. 190.

**B. Commerce's Preliminary Results**

Commerce issued the *Preliminary Results* on May 2, 2024. *Preliminary Results*, 89 Fed. Reg. 35,794. Commerce preliminarily determined that six Russian subsidy programs were countervailable during the POR, including the Provision of Natural Gas for LTAR program, and calculated a preliminary *ad valorem* subsidy rate of 18.83 percent for JSC Apatit. *See id.*; PDM at 9-10. Regarding the Provision of Natural Gas for LTAR program in particular, Commerce had previously found the program to be countervailable in the investigation and the first administrative review ("AR1"), and Commerce found that the GOR did not submit any new information in this review to warrant reconsideration of its prior determination. PDM at 14. Accordingly, Commerce preliminary determined that Gazprom's sales of natural gas to JSC Apatit conferred a financial contribution and that the program is *de facto* specific. *See id.* at 7, 14-19.

To assess the adequacy of remuneration that JSC Apatit paid for natural gas provided by the GOR, and thereby calculate the amount of benefit conferred under this program, Commerce applied the hierarchy for selecting a benchmark under 19 C.F.R. § 351.511(a)(2). PDM at 14-15. Consistent with its findings in the investigation, Commerce preliminarily determined that there

were no suitable tier one benchmarks (*i.e.*, in-country prices) because the GOR's predominant role in the Russian market for natural gas during the POR distorted the market. PDM at 15-17. Commerce then evaluated whether there were viable tier two benchmarks on the record, pursuant to 19 C.F.R. § 351.511(a)(2)(ii), namely a "world market price where it is reasonable to conclude that such price is available to purchasers in the country in question." PDM at 17.

Commerce stated that the record contained the following world market natural gas pricing data: OECD natural gas prices for Europe, and corresponding taxes, sourced from the IEA, which Mosaic had submitted; and Kazakh natural gas export prices under customs classification code 2711.21.0000 sourced from BNS, which JSC Apatit had submitted. *Id.* Commerce focused its analysis of potential benchmarks on the existence of natural gas pipelines through which gas could be exported to Russia. Commerce stated that it had found in other proceedings that the natural gas pipelines connecting Europe and Russia are not bi-directional and are not fitted with the necessary compressors to allow the inflow of gas from Europe into Russia. *Id.* at 17-18. On this basis, Commerce further stated that it continued to find that natural gas from Europe would not be available to purchasers in Russia, and thus that the European export prices reflected in the IEA data were not viable tier two world market prices. *Id.* at 17.

Commerce also preliminarily found, however, that natural gas exported from Kazakhstan was available to purchasers in Russia during the POR. In support of this finding, Commerce cited export statistics from BNS that showed that Kazakhstan exported natural gas to Russia during the POR, and customs data from the Russian Federal Customs Service that showed that Russia imported natural gas from Kazakhstan during the POR under HTS code 2711.21.0000. Commerce also stated that evidence from Kazakh natural gas producer Karachaganak Petroleum Operating BV ("KPO") indicated that KPO sold natural gas to Gazprom's Orenburg Gas

Processing Plant in Russia in 2021 using the Karachaganak Orenburg Transportation System pipeline, which connects to and terminates in Russia. *Id.* at 18. On the basis of this information, Commerce preliminarily concluded that natural gas exported from Kazakhstan was available to purchasers in Russia, and therefore that Kazakh export prices for natural gas were usable as a tier two benchmark. *Id.*

In its pre-preliminary calculations memorandum, Commerce stated that it removed Kazakhstan's exports to Russia from the data in accordance with 19 C.F.R. § 351.511(a)(2)(ii), and it excluded Kazakhstan's exports to the People's Republic of China (China) from the benchmark calculations, as Commerce has previously determined as adverse facts available that China's domestic natural gas market is distorted. *See* Memo from USDOC to File, Prelim Calcs Memo - JSCA at 4 (Apr. 26, 2024), P.R. No. 255, C.R. No. 260 ("JSC Apatit Prelim. Calc. Mem."); PDM at 18. Commerce then calculated an annual average of the remaining Kazakh export prices, which it compared to the prices that JSC Apatit paid for its natural gas purchases during the POR, including taxes and delivery charges. PDM at 18. Where the benchmark unit price was greater than the price paid to the GOR authorities, Commerce multiplied the difference by the quantity of natural gas purchased to arrive at the benefit. *Id.* Commerce then added the benefits from JSC Apatit's purchases of natural gas from Gazprom and divided the amount by JSC Apatit's total POR sales to calculate a subsidy rate of 3.00 percent *ad valorem* for this program. JSC Apatit Prelim. Calc. Mem. at 4, P.R. No. 255, C.R. No. 260; PDM at 18-19.

Mosaic and JSC Apatit timely filed case briefs and rebuttal briefs on July 23, 2024, and August 5, 2024, respectively. *See* IDM at 2. Mosaic argued in its case brief that Commerce erred in preliminarily selecting a tier two benchmark composed of Kazakh export prices. *See* Brief from Wilmer Cutler Pickering Hale and Dorr LLP, Petitioner Case Brief at 2-19 (July 23,

2024), P.R. No. 274, C.R. No. 270 ("Mosaic Case Br."). In particular, Mosaic argued that the record evidence showed that Kazakh natural gas data are not suitable as a tier two benchmark because Russian purchasers do not have access to a world market price for processed Kazakh natural gas comparable to the gas that the GOR provided for LTAR. *Id.* at 2-17. For example, Mosaic noted that the record evidence showed that Kazakh's official trade statistics are inconsistent across different governments' data. The record showed that the Bureau of National Statistics reported exports to Russia, China, Ukraine, and Turkey, but the Ministry of Finance reported no exports to Russia in 2022. Additionally, the data could not be corroborated with the corresponding official trade reports from importing countries: Ukrainian official import statistics showed no natural gas imports from Kazakhstan, and the Government of Turkey did not report natural gas imports from any country. Furthermore, the record showed that there were discrepancies in the volume and reported value between confidential data provided by the GOR for natural gas imports from Kazakhstan and official Kazakh export data. *Id.* at 5-7.

Mosaic also argued that Gazprom is the only importer of natural gas from Kazakhstan. Mosaic stated that, contrary to the Department's preliminary finding, the record evidence showed that the gas that KPO sold to Gazprom consisted of "raw (high-sulfur)" gas, which is a different product than the natural gas the GOR provided to JSC Apatit. *Id.* at 9. The record evidence also showed that this gas – a biproduct of oil production from Kazakhstan's Karachaganak field – is sent from Kazakhstan to Gazprom's Orenburg Gas Processing Plant in Russia for processing, pursuant to an arrangement between Gazprom and KazRosGas ("KRG"), and that after Gazprom processes this gas, Gazprom re-exports finished gas derived from the Kazakh raw gas back to Kazakhstan. *Id.* at 9-11. The record also indicated that the only pipeline used to import Kazakh gas into Russia, excluding gas that merely transits through Russia to other countries, was the

pipeline connecting a KRG plant in Kazakhstan with Gazprom's Orenburg gas processing plant. *Id.* at 9.

Mosaic also argued that the record evidence did not support a finding that raw Kazakh gas, or any other Kazakh gas imported into Russia, is available to Russian purchasers at a world market price, rather than at a GOR-determined price. To the contrary, the record evidence showed that, to the extent that any finished Kazakh gas remained in Russia after processing, it consisted of a product processed and sold by Gazprom – *i.e*., by the GOR – rather than a non-Russian product traded on the world market. *Id.* at 9-10. Thus, there was no evidence that export prices for processed Kazakh gas were "available to" purchasers in Russia during the POR.

Finally, Mosaic argued that, in addition to the fact that Kazakh natural gas is not "available" to Russian purchasers, the BNS data were not usable as a tier two benchmark because the GOK's significant involvement in the Kazakh natural gas market distorts all Kazakh gas prices, including both domestic and export prices. The record demonstrated that Kazakh gas exports represented the transfer from one government-distorted market to another and did not show that the market-determined price was available to any Russian purchasers other than Gazprom. *Id.* at 11-16.

The record also showed that Kazakhstan's natural gas sector is predominantly state controlled, with KazMunayGas ("KMG") and its subsidiary KazTransGas ("KTG")/QazaqGaz overseeing production, transit, and distribution. *Id*. at 12-13. Mosaic argued this structure enabled the GOK to influence the prices of gas, including exported gas. *Id*. at 13.

The record further demonstrated that Russian state-affiliated entities, primarily Gazprom, controlled the transit pipelines for Kazakh gas exports to Europe. *Id*. at 13-14. Gazprom's monopoly on Russian pipeline access allowed it to control gas volumes and pricing and

contributed to reduced exports through Ukraine in 2022 and the expansion of Russian gas transit operations in Turkey. *Id*. at 14-15.

Finally, the record showed that sanctions on Russia and associated geopolitical risks influenced the prices of gas transported via Russian infrastructure, including for gas exported from Kazakhstan. *Id*. at 16-17. Mosaic argued that these factors, combined with reduced demand, currency shifts, increased risk, and depressed regional gas prices, undermined the reliability of Kazakh gas exports for use as a benchmark. *Id*.

For all of these reasons, Mosaic argued that Commerce should instead rely on the European OECD natural gas prices sourced from the IEA to construct a tier three benchmark for natural gas prices in Russia, consistent with its approach in the investigation. *Id.* at 18-19.

**C. Commerce's Final Results**

Commerce issued the Final Results on November 5, 2024. *Final Results*, 89 Fed. Reg. 88,960. In the Final Results, Commerce continued to find that export prices for Kazakh-origin natural gas are "available to" purchasers in Russia and, therefore, that Kazakh export prices to "non-distorted, non-Russian" countries could serve as a tier two benchmark under 19 C.F.R. § 351.511(a)(2)(ii). IDM at 29. In support of this finding, Commerce pointed to Russian imports of natural gas from Kazakhstan under customs code 2711210000; that Kazakh export statistics showed exports of Kazakh natural gas to Russia during the POR; and that Kazakh natural gas producer KPO stated that it sold natural gas to the Orenburg Gas Processing Plant using the Karachaganak Orenburg pipeline. *Id.* Commerce also stated that, "{i}n prior cases, . . . the GOR has confirmed that imports under this customs code (2711210000) are placed under a customs procedure of a release into free circulation." *Id.*

Although Commerce noted Mosaic's argument that the distortion of Russia's natural gas market precludes the use of Kazakh-origin gas prices as tier two benchmark, it asserted that the

distortion of the domestic Russian market (including with respect to imported gas) disqualifies Kazakh-origin prices only as a tier one benchmark, but not as a tier two benchmark. IDM at 30. In particular, Commerce explained that the relevant question for tier two is whether Kazakh-origin natural gas is "available" to purchasers in Russia within the meaning of 19 CFR 351.511(a)(2)(ii), and Commerce concluded that it was. *Id.* Commerce did not address Mosaic's argument that raw natural gas exported from Kazakhstan is not comparable to the processed natural gas the JSC Apatit purchases from Gazprom. *See id.*

Commerce also rejected Mosaic's argument that distortion in the Kazakh domestic market and Kazakh government influence demonstrates that Kazakh export prices cannot be used as a tier two benchmark. Citing its prior practice, Commerce stated that distortion in the domestic market does not necessarily mean that export prices from that market are also distorted. *Id.* at 30-31.

In addition, Commerce dismissed Mosaic's argument that Kazakhstan's export prices to Türkiye and Ukraine were distorted by Russian control of the relevant pipeline infrastructure and government interventions. Commerce found that Mosaic failed to demonstrate that the markets in Türkiye and Ukraine were distorted and that such geopolitical factors reflect the "commercial realities of the world market," which are in turn factored into a world market price. *Id.* at 31-32.

Finally, Commerce rejected Mosaic's argument that it should use IEA industry natural gas prices as a tier three benchmark, because it determined that Kazakh export prices were usable as a tier two benchmark. *Id.* at 32.

## IV. <u>STANDARD OF REVIEW</u>

In reviewing Commerce's CVD determinations, the Court will hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial

evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 26 C.I.T. 892, 893 (2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). The substantial evidence standard also requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

The Court of Appeals for the Federal Circuit has explained that this standard of review encompasses the "arbitrary and capricious" standard established under the Administrative Procedure Act. *See Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)). "{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)). Thus, Commerce must treat like situations similarly and may not depart from a prior practice, unless "it provides a reasoned explanation for its change." *Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1365 (CIT 2019) (citing *Rust v. Sullivan*, 500 U.S. 173, 187 (1991); *State Farm*, 463 U.S. at 42). Failure to consider "an important aspect of the problem" similarly renders a determination by an agency arbitrary. *State Farm*, 463 U.S. at 43. Agency determinations that ignore relevant statutory or regulatory language, or interpret that language contrary to its plain meaning, are also not in accordance with law. *See Zhejiang DunAn*

*Hetian Metal Co. v. United States*, 34 C.I.T. 408, 437 (2010), *vacated on other grounds*, 652 F.3d 1333 (Fed. Cir. 2011).

Finally, Commerce is required by law to provide in the final determination "an explanation of the basis for its determination that addresses relevant arguments {} made by interested parties." 19 U.S.C. § 1677f(i)(3)(A). Failure to do so renders a CVD determination unlawful. *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009).

## V. ARGUMENT

### A. Commerce's Selection of Kazakh Export Prices as a Tier Two Benchmark for Natural Gas is Unreasonable, Not Supported by Substantial Evidence, and Otherwise Not in Accordance With Law

In the Final Results, Commerce correctly determined that the GOR provided a countervailable subsidy to JSC Apatit during the POR in the form of natural gas for LTAR. Commerce erred, however, by using Kazakh export prices sourced from BNS as a "tier two" benchmark to measure the benefit that the subsidy conferred on JSC Apatit. As this Court found in *Archer Daniels Midland Co. v. United States*, and as Commerce agreed on remand, natural gas exported from Kazakhstan is unprocessed, "raw" gas that is not comparable to the gas that JSC Apatit purchases from the GOR. *Archer Daniels Midland Co. v. United States*, 779 F. Supp. 3d 1349, 1367 (CIT 2025) ("*Archer Daniels Midland I"*) at 27; *Phosphate Fertilizers From the Russian Federation: Final Results of Redetermination Pursuant to Court Remand, Archer Daniels Midland Co. v. United States,* No. 23-00239, Slip Op. 25-55 (Dep't Commerce Aug. 4, 2025) at 13-14. This lack of comparability necessitates a remand in this proceeding as well.

Moreover, even if the products were comparable, the Kazakh export prices are not a suitable benchmark because the record shows Kazakh gas exports are sold to Gazprom's Orenburg Processing Plant for processing. A remand is required so Commerce can explain why sales to the Russian government entity that distorts Russia's natural gas market are within the

intended meaning of "purchaser" in the regulation. *Archer Daniels Midland I*, 779 F. Supp. 3d at1367.

In the alternative, the record also shows that Kazakh export prices are not reliable and that all Kazakh gas prices are distorted by significant government interventions. Commerce should have found that there are no usable tier two benchmarks on the record and instead resorted to constructing a tier three benchmark using OECD prices sourced from the IEA, as it did in the original investigation and in AR1 on remand.

In sum, the Court should hold Commerce's selection of a benchmark for natural gas was unreasonable, not supported by substantial evidence, and otherwise not in accordance with law and remand for reconsideration.

**1. Commerce's Legal Framework for Measuring the Adequacy of Remuneration Paid for Government-Provided Goods and Services**

Section 771(5)(B) of the Tariff Act states that a subsidy exists within the meaning of the Act if, *inter alia*, an authority "provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). Section 771(5)(D) of the Act includes the provision of goods and services among the government actions that fall within the definition of the term "financial contribution." Section 771(5)(E) of the Act, in turn, addresses the issue of "benefit." It states that "{a} benefit shall normally be treated as conferred where there is a *benefit to the recipient*, including . . . (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration . . . ." 19 U.S.C. § 1677(5)(E) (emphasis added).[1]

[1] Section 771(5)(E) further states that:

> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to the

Section 351.511(a)(2) of Commerce's regulations sets out the three-tier hierarchy that Commerce uses to select benchmarks to measure the adequacy of remuneration paid for goods or services. 19 C.F.R. § 351.511(a)(2). First, under tier one, Commerce seeks to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question. 19 C.F.R. § 351.511(a)(2)(i). Next, if there is no useable market-determined price, then under tier two Commerce seeks to measure the adequacy of remuneration by comparing the government price to a "world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). Finally, if there is no world market price available to purchasers in the country in question, then under tier three Commerce normally measures the adequacy of remuneration "by assessing whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii).

### 2. Kazakh Export Prices Are Not a Suitable Benchmark Because the Raw Kazakh Gas is a Different Product From the Refined Russian Gas Provided for Less Than Adequate Remuneration

In *Archer Daniels Midland Co. I*, this Court held that the refined natural gas that the GOR provided to JSC Apatit is a different product from the raw natural gas exported from Kazakhstan to Gazprom's Orenburg Processing Plant. The Court found that "Gazprom only purchases raw gas, which it then refines and primarily exports back to Kazakhstan" but "JSC's gas purchases . . . were of refined natural gas, and presumably the benchmark would reflect the subsidized product, not some other product." *Archer Daniels Midland Co. I*, 779 F. Supp. 3d

investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

19 U.S.C. § 1677(5)(E).

1349 at 1367. The Court remanded to Commerce to consider "the question of the comparability of the benchmark third-party sales and the sales into Russia . . ." *Id*.

On remand, Commerce found that "the raw natural gas exported by Kazakhstan is not comparable to the refined natural gas available in the Russian market that JSC Apatit purchased from GOR authorities during the POR." *Archer Daniels Midland Co. v. United States*, No. 23-00239, 2026 WL 323717, at *6 (CIT Feb. 6, 2026) (*"Archer Daniels Midland Co. II"*). Commerce noted that the high sulfur content in Kazakh gas renders it unusable in commercial and industrial settings without expensive additional processing to be fit for consumption, and the unprocessed "sour" or "raw" gas is typically reinjected into wells to support oil production or disposed of. *Id.* Commerce concluded that raw Kazakh natural gas prices are not an appropriate tier-two benchmark because such gas is not comparable to the natural gas used to produce the subject good, *i.e.*, the natural gas that JSC Apatit purchases from the GOR. *Id.*

This Court affirmed Commerce's decision on remand. *Id.* at *5-6. The Court found Commerce's explanations to be reasonable and well supported, and that the record evidence substantially supported Commerce's conclusion that raw natural gas exported from Kazakhstan is not comparable to the natural gas that JSC Apatit purchased. *Id.* at *6.

The record of AR2 contains nearly identical evidence showing that the natural gas exported from Kazakhstan is not comparable to the finished gas JSC Apatit purchases from the GOR. In particular, the record shows that the gas that KPO sold to Gazprom consisted of "raw (high-sulfur)" gas. *See* Letter from Wilmer Cutler Pickering Hale and Dorr LLP, Petitioner Benchmark Rebuttal Submission (Mar. 4, 2024) ("Mosaic Benchmark Rebuttal Submission"), Exhibit 14 at 158, 162-163, 181, P.R. Nos. 202-05 Commerce failed to address Mosaic's argument that raw Kazakh gas is not comparable to the finished gas JSC Apatit purchases,

rendering its determination unsupported by substantial evidence and therefore unlawful. *See NMB Sing. Ltd.*, 557 F.3d at 1320. Nonetheless, following the reasoning of *Archer Daniels Midland Co. I* and *Archer Daniels Midland Co. II*, the Court should find that Kazakh export prices are not a suitable benchmark for JSC Apatit's purchases of natural gas because the two types of natural gas are not comparable, and it should remand to Commerce to reconsider its selection of the Kazakh export prices as a tier two benchmark for natural gas.

### 3. Kazakh Export Prices Are Not World Market Prices That Would Be Available to Purchasers in Russia Within the Meaning of 19 C.F.R. § 351.511(a)(2)(ii)

As in *Archer Daniels Midland I*, the Court should also find that Commerce's selection of the Kazakh export prices as a tier two benchmark is unsupported and contrary to law because such prices are not "available to purchasers" within the meaning of its regulation. The *Preamble* to Commerce's regulations provides guidance on Commerce's application of its three-tier methodology. With respect to tier two, the *Preamble* states:

> Paragraph (a)(2)(ii) provides that, if there are no useable market-determined prices stemming from *actual* transactions, we will turn to world market prices that *would be available* to the purchaser. We will consider whether market conditions are such that the purchaser could obtain the good or service on the world market. For example, a European price for electricity normally would not be an acceptable comparison price for electricity provided by a Latin American government, because electricity from Europe in all likelihood would not be available to consumers in Latin America. . . .

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998) ("*Preamble*") (emphasis in original). Similarly, with respect to tier three, the *Preamble* states that "in situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles. . . ." *Id.*

Thus, a benchmark price must be one that is "available to purchasers," meaning consumers, of the good provided for less than adequate remuneration. Commerce's selection of

Kazakh export prices as a tier two benchmark for natural gas is contrary to law because such prices are not available to purchasers in Russia within the meaning of section 351.511(a)(2)(ii) of its regulations. Commerce's finding to the contrary is based on a flawed interpretation of its regulation and unsupported by substantial evidence.

Specifically, Commerce found that Kazakh-origin gas was "available to purchasers" because "Kazakh natural gas producer KPO stated that it sold natural gas to the Orenburg Gas Plant in Russia using the Karachaganak Orenburg pipeline." IDM at 29. Commerce cited the fact that there is a trunk gas pipeline between Kazakhstan and Russia that terminates at Gazprom's Orenburg Gas Processing plant in Russia, and that Kazakh natural gas producer KPO stated that it sold natural gas to Gazprom's Orenburg facility in 2022. IDM at 29. Commerce also cited the fact that BNS data showed exports of natural gas from Kazakhstan to Russia under GOR customs code 2711210000, stating "{i}n prior cases, . . . the GOR has confirmed that imports under this customs code (2711210000) are placed under a customs procedure of a release into free circulation." IDM at 29. Commerce's findings that Kazakh export prices are available to purchasers in Russia are unsupported for three reasons.

*First*, there is no record evidence that KPO sold Kazakh natural gas – whether raw or processed – to actual consumers in Russia. The mere fact that there is a pipeline connection between Kazakhstan and Russia and that official Kazakh customs data show exports to Russia is not evidence that Kazakh export prices are "available to purchasers" in Russia within the meaning of the regulation. To the contrary, the record shows that Gazprom purchases the raw Kazakh gas pursuant to a tolling arrangement, and that after Gazprom processes the gas, it

returns the processed, pipeline-quality gas to Kazakhstan for consumption within Kazakhstan.[2] Mosaic Benchmark Rebuttal Submission, Exhibit 14 at 118, 122, 132, P.R. Nos. 202-05. This evidence fairly detracts from Commerce's finding that Kazakh export prices are "available to purchasers" in Russia. *CS Wind*, 832 F.3d at 1373.

*Second*, the record shows that Kazakh exports of natural gas are only "purchased by" the Orenburg Gas Processing Plant. IDM at 29. As Mosaic argued to Commerce, the Orenburg Gas Processing Plant is not a consumer of natural gas within the meaning of section 351.511(a)(2). Mosaic Case Br. at 8-10; Mosaic Benchmark Rebuttal Submission, Exhibit 14 at 158, 162-163, 181, P.R. Nos. 202-05. Rather, as its name indicates, the Orenburg facility – which is owned by Gazprom – is a producer and processor of natural gas. Thus, even if Kazakh natural gas was "available to" and "purchased by" Gazprom's Orenburg Gas Processing Plant, this does not constitute substantial evidence that Kazakh natural gas was "available" to consumers in Russia, such that the prices for the Kazakh gas would be suitable for use as a tier two benchmark under Commerce's regulation.

*Third*, Commerce's approach is unreasonable because the only documented purchaser of Kazakh gas exports, Gazprom, is the very same Russian governmental authority responsible for the distortion of Russia's natural gas market. In *Archer Daniels Midland Co. I*, Commerce argued that section 351.511(a)(2)(ii) should not be interpreted to mean that benchmark prices must be available to private entities or consumers in Russia. *See*, 779 F. Supp. 3d at 1366. However, the Court found that it is not "reasonable to infer from the sale of Kazakh natural gas to a single government-owned entity," Gazprom, "the very entity that Commerce found distorts

[2] As explained above in Section V(A)(2), the record shows that the Kazakh gas was "sour gas" or "raw (high-sulfur)" gas, a byproduct of oil production, shipped to Gazprom's Orenburg gas processing plant for treatment and was a materially different product from the refined gas that GOR provided to JSC Apatit. Mosaic Case Br. at 9.

Russia's domestic natural gas market in the first place," "that Kazakh natural gas would be available to 'purchasers' in the country in question within the meaning of the regulation." *Id*. at 1367 . The Court remanded to Commerce to explain why sales to a government entity that distorts the market falls under the meaning of a "purchaser."[3] *Id.*.

Like the AR1 record, the AR2 record shows that Kazakh natural gas is only sold to a single government-owned purchaser in Russia, Gazprom, which is the same Russian governmental authority that is responsible for the distortion of Russia's natural gas market. Mosaic Benchmark Rebuttal Submission, Exhibit 14 at 158, 162 n.36, 163, 181, P.R. Nos. 202-05. Consistent with the Court's decision in *Archer Daniels Midland Co. I*, the Court should find that Commerce's choice to use Kazakh export prices as a tier two benchmark is not based on a reasonable interpretation of the regulation.

*Finally*, Commerce correctly rejected respondents' arguments that Russian domestic prices are usable as a tier one benchmark because of the GOR's interference in the Russian gas market and Gazprom's control of the Russian gas distribution network. *See* PDM at 17. It was arbitrary and capricious for Commerce to then find that Kazakh export prices – where both the prices and the gas are practically available only to Gazprom, the very Russian governmental authority responsible for the distortion of the Russian gas market – qualify as market-determined prices that would be available to purchasers in Russia and thus are usable as a tier two benchmark.

In sum, if the Court reaches this issue, it should find that Commerce's selection of the Kazakh export prices as a tier two benchmark is unreasonable, unsupported by substantial

[3] Commerce did not reach this issue on remand because it found Kazazkh exports of "raw" or unprocessed natural gas are not comparable to the natural gas that JSC Apatit purchases from the GOR. See *Phosphate Fertilizers From the Russian Federation: Final Results of Redetermination Pursuant to Court Remand, Archer Daniels Midland Co. v. United States,* No. 23-00239, Slip Op. 25-55 (Dep't Commerce Aug. 4, 2025) at 14.

evidence, and otherwise not in accordance with law because such prices are not "available to purchasers" within the meaning of the regulation. The Court should remand to Commerce for reconsideration.

**4. The Kazakh Export Prices Are Not Reliable and Cannot Serve as a Tier Two Benchmark**

In the alternative, Commerce's selection of Kazakh export prices as a tier two benchmark is unsupported by substantial evidence because the underlying data are unreliable. The record shows fundamental discrepancies between the export values submitted by JSC Apatit and official statistics reported by both Kazakh and importing countries' authorities. The Court should reject Commerce's construction of a two benchmark based on such inconsistent data.

Commerce used Kazakh export data under customs code 2711.21.0000 for natural gas shipments to Russia, China, Ukraine, and Turkey, consistent with JSC Apatit's submission. IDM at 29; JSC Apatit Benchmark Submission at Appendix 1, P.R. No. 144, C.R. No. 190. However, the record shows that different Kazakh government ministries reported inconsistent trade statistics data. Indeed, the Ministry of Finance of the Republic of Kazakhstan reported no exports of natural gas from Kazakhstan to Russia in 2022. *See* Mosaic Benchmark Rebuttal Submission, Exhibit 3, P.R. No. 201.

The record also does not support JSC Apatit's claims about exports of Kazakh natural gas to other destinations. Ukrainian official import statistics show no imports of natural gas from Kazakhstan, and the Government of Turkey does not report any natural gas imports from any country. Mosaic Benchmark Rebuttal Submission, Exhibits 3-4, P.R. No. 201. Further, Russian data are not publicly available, and the confidential data that the GOR provided do not align with the Kazakh export data on which Commerce relied. *Compare* JSC Apatit Benchmark Submission at Appendix 1, P.R. No. 144, C.R. No. 190, *with* Government of Russia Letter,

Response of the Ministry of Economic Development of the Russian Federation to the Request for Factual Information (Feb. 16, 2024) ("GOR Response") at 1, P.R. No. 141.

Commerce's benchmark selection must be based on "the best available information," and Commerce is obliged to assess the accuracy and reliability of the data it uses to construct countervailing duty margins. 19 U.S.C. § 1677b(c)(1). Here, the Kazakh export data submitted by JSC Apatit could not be corroborated by other official sources and exhibited material inconsistencies and inaccuracies. Commerce's reliance on this unreliable and inconsistent data is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law. The Court should remand to Commerce for reconsideration.

#### 5. The Kazakh Export Prices Sourced from BNS Are Not Suitable as a Tier Two Benchmark Because All Kazakh Gas Prices Are Distorted by Government Involvement in the Market

In addition to the reasons discussed above, the Kazakh export prices are also not suitable for use as a tier two benchmark because the record shows that all Kazakh gas prices are distorted by significant government interventions in the market. The *Preamble* clearly states that Commerce will not use prices that are significantly distorted as a result of the government's involvement in the market as a benchmark for measuring the adequacy of remuneration. *Preamble*, 63 Fed. Reg. at 65,377 ("Where it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's involvement in the market, we will resort to the next alternative in the hierarchy."). Consistent with the *Preamble*, Commerce has a well-established practice of rejecting potential benchmark prices that it has found to be distorted by government involvement in the market. *See Certain Softwood Lumber Products From Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review, 2020*, 87 Fed. Reg. 48,455 (Dep't Commerce Aug. 9, 2022), and accompanying Issues and Decision Memorandum, Comment 14; *Certain Uncoated Groundwood*

*Paper From Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Dep't Commerce Aug. 9, 2018), and accompanying Issues and Decision Memorandum, Comment 21.

Here, Mosaic submitted extensive evidence showing that the GOK's significant involvement in the Kazakh natural gas market distorts all Kazakh gas prices, including both domestic and export prices. The GOK owns and controls a substantial share of natural gas production and transportation in Kazakhstan through the Samruk-Kazyna JSC sovereign wealth fund; KMG, the GOK-owned oil and gas company; and other GOK-controlled entities. Mosaic Benchmark Rebuttal Submission, Exhibit 20 at 23, P.R. No. 206. KMG "represents Kazakhstan's interests in the national oil and gas industry" and is responsible for the exploration, production, transportation, and sale of oil, gas, and other hydrocarbons in Kazakhstan. *Id.*, Exhibit 7, P.R. No. 201; *id.*, Exhibit 20 at 34, 48, 50, P.R. No. 207. In addition to owning and controlling KMG, the GOK also owns a stake in the country's other major gas producer, KPO, which is the source of the gas sold to Gazprom pursuant to the tolling arrangement discussed above. *Id.*, Exhibit 14 at 86, P.R. Nos. 202-03; *id.*, Exhibit 20 at 34, P.R. No. 206.

Mosaic also submitted evidence showing that the GOK sets prices for natural gas and controls gas transportation in Kazakhstan. Specifically, the GOK controls the transport and price of natural gas in Kazakhstan through state-owned KTG. *See id.*, Exhibit 14 at 134-135, P.R. Nos. 202-03. KTG is "the designated 'national operator' of all gas transmission and distribution infrastructure in" Kazakhstan, and it "also has exclusive rights to purchase (associated) gas from producers, sell gas on the local market, and export gas." *Id.*, Exhibit 14 at 121-122, P.R. Nos. 202-03; *id.*, Exhibit 20 at 36, P.R. No. 206. KTG is also the GOK's representative in major gas pipeline operations involving foreign partners. *Id.*, Exhibit 8, P.R. No. 201. In 2021, the GOK

restructured KTG to strengthen its control over the country's natural gas industry. *Id.*, Exhibits 7, 8, 19, P.R. Nos. 201, 207.

Commerce unreasonably dismissed this evidence, finding that distortion of the Kazakh domestic market should have "no bearing" on its ability to use Kazakh export prices as a tier two benchmark. IDM at 30-31. However, Commerce relied on very similar evidence regarding the GOR's involvement in the Russian natural gas market to find that Russian gas prices are distorted and unsuitable as a benchmark. PDM at 17. In prior cases, Commerce has specifically found that Russian *export* prices are unsuitable for use in constructing a natural gas benchmark due to the GOR's involvement in the Russian market and Gazprom's control of the Russian gas distribution network and exclusive right to export natural gas. *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020), accompanying Issues and Decision Memorandum at 23 (*citing, e.g.*, *Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part; 2016*, 83 Fed. Reg. 63,472 (Dec. 10, 2018) and accompanying Preliminary Decision Memorandum at 22). Mosaic presented very similar evidence regarding the GOK's involvement in the Kazakh market and state-owned KTG's control over the distribution and export of Kazakh gas. It was arbitrary and capricious for Commerce to reject this evidence as irrelevant to its finding that Kazakh export prices are suitable as a tier two benchmark.

## VI. CONCLUSION

Mosaic respectfully requests that the Court find that Commerce's selection of Kazakh export prices as a tier two benchmark for the Provision of Natural Gas for Less Than Adequate Remuneration ("LTAR") program is unreasonable, unsupported by substantial evidence, and

otherwise not in accordance with law, and remand for redetermination consistent with the Court's opinion.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Min Seong Kim
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: September 11, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this Memorandum in Support of Mosaic's Rule 65.2 Motion for Judgment on the Agency Record complies with the word limitation requirement. The word count for this submission, as computed by Wilmer Hale LLP's word processing system, is 7,080 words.

/s/ Stephanie E. Hartmann
(Signature of Attorney)

Stephanie E. Hartmann
(Name of Attorney

The Mosaic Company
(Representative Of)

September 11, 2026
(Date)